**BOWERSOCK MILLS & POWER CO. v. COMMISSIONER OF INTERNAL REVENUE.**

No. 3673.

United States Court of Appeals
Tenth Circuit.

Feb. 9, 1949.

HUXMAN, Circuit Judge, dissenting.

John G. Madden, of Kansas City, Mo. (James E. Burke and Frank Brockus, both of Kansas City, Mo., on the brief), for petitioner.

S. Dee Hanson, of Washington, D. C. (Theron Lamar Caudle, George A. Stinson, Ellis Slack and Fred E. Youngman, all of Washington, D. C., on the brief), for respondent.

Before PHILLIPS, Chief Judge, HUXMAN and MURRAH, Circuit Judges.

MURRAH, Circuit Judge.

The only question presented by this appeal is whether, for income tax purposes, an item of $18,000.00 paid by the petitioner, taxpayer, as "preferred stock interest" during the taxable year 1943, was interest on indebtedness, hence deductible under Section 23(b) of the Internal Revenue Code,[1] or dividends on stock and subject to tax. This item was not claimed in the income tax return for the year 1943, but was later asserted by a claim for refund. The Tax Court sustained the Commissioner's disallowance of the claim, and the petitioner has appealed.

The question is presented on facts which are not in dispute. For many years, R. C. Jackman and J. D. Bowersock were equal partners in the milling, grain and water power business at Lawrence, Kansas. Upon the death of Bowersock in 1922, the Jackman family purchased the Bowersock interest for a cash payment and interest-bearing notes in the amount of $550,000.00 effective January 1, 1929, the properties were incorporated under the name of The Bowersock Mills and Power Company, with an authorized capital of $600,000.00, represented by 6,000 shares of common stock, $100.00 per share. In lieu of the outstanding notes, the corporation gave the Bowersock Trust first mortgage bonds in the amount of $550,000.00, with staggered interest at the rate of 5%, 5½% and 6%, payable in stipulated installments, and secured by a first deed of trust on the assets of the corporation.

In 1935, the corporation defaulted on its interest payment, and in 1938 it defaulted on a payment of principal due. Because of this default, the bank with which it had been doing business declined to extend further credit, necessary to carry on the business of the Company, as a result of which the corporation found itself in dire financial straits. The Bowersock Trust had no desire to foreclose on its deed of trust or to operate the properties. Accordingly, after considerable negotiations over a period of months, J. D. Bowersock, Jr., representing the Trust, drafted two contemporaneous contracts dated January 1, 1939.

The first contract between the Bowersock Trust and the corporation, recited the Trust ownership of the bonds in the amount of $550,000.00, with accrued interest, and the desire of the parties to "change the form of said indebtedness so that the said first mortgage may be released and the capital structure of the party of the second part [corporation] improved * * *." The contract provided that the corporation would amend its charter to authorize the issuance of 6,000 shares of preferred stock, to be issued to the Bowersock Trust in payment of the first mortgage bonds with accrued interest, and in consideration of the release of the first deed of trust. It also provided that the capitalization of the corporation would be reduced from $600,000.00 to $300,000.00, represented by 3,000 shares of common stock at $100.00 per share. The 6,000 shares of preferred stock were to be preferred, both as to dividends and assets, and bear cumulative dividends of 3%, payable annually "if the net earnings at the time are sufficient to pay such dividends." The contract also provided for the execution of installment notes for additional accrued and unpaid interest in the amount of $58,000.00.

The second contract, entered into on the same date as part of the transaction, was between the Bowersock Trust and the common stockholders of the corporation. That

---

[1] "(b) Interest. All interest paid or accrued within the taxable year on indebtedness, except on indebtedness incurred or continued to purchase or carry obligations (other than obligations of the United States issued after September 24, 1917, and originally subscribed for by the taxpayer) the interest upon which is wholly exempt from the taxes imposed by this title. * * *" 26 U.S.C.A. § 23 (b).

contract also recited the Trust's ownership of the bonds and referred to the contemporaneous agreement to accept the 6,000 shares of preferred stock in payment of the principal and accrued interest on the bonds. It then went on to provide that the trustees would sell, and the common stockholders would purchase, the 6,000 shares of preferred stock for $90.00 per share, beginning January 1, 1944, in such number that the total payment to the trustees of dividends and purchase price would amount to not less than $31,500.00 per year, or $18,000.00 interest and dividends, and $13,500.00 on the purchase price of the preferred stock. To insure the payment of the so-called dividends on the preferred stock and the notes for the defaulted interest in accordance with the first agreement, and to insure the purchase of the preferred stock as agreed in the second contract, the latter contract went on to provide that the common stockholders would transfer all of their common stock (except the qualifying shares) to the Lawrence National Bank at Lawrence, Kansas, in trust, on condition that in the event of default of the corporation on the preferred stock dividends for a period of six months, or the failure of the common stockholders to cause the corporation to purchase the stock as provided in the contract, the bank, upon demand of the trustees, would immediately assign and transfer to the Bowersock Trust absolutely, as liquidated damages, all of the common stock of the corporation; that the trustees would be entitled to the issuance of new certificates of common stock in the Company, subject only to eighteen months redemption after default. The qualifying shares of common stock were to be endorsed in blank, and delivered to the Bank, with the resignation of the directors and officers, to take effect when and if the trustees became entitled to the transfer of the common stock under the terms of the contract. The preferred stock was also to be transferred to the Bank in trust, with directions to deliver the same to the common stockholders as and when purchased under the terms of the second contract.

Upon the execution of these agreements, the bank credit of the corporation was restored, and thereafter it met the obligations of the contracts. The payments of $18,000.00 for the years 1941 and 1942 were carried on the corporation's ledger as "preferred stock interest." The journal voucher also contained: "The following entries to set up preferred stock dividends for 1941 and 1942. Charge interest $18,000.00; credit Bowersock Trusts $18,000.00". A sheet from the corporation's ledger entitled "Notes Payable—M. G. & J. D. Bowersock Trust" shows credit interest of December 16, 1942 of $18,000.00 for 1941, and $18,000.00 for 1942, as "preferred stock interest". The corporation's journal voucher of December 16, 1942 shows similar entries under the heading "General Ledger". The general ledger also contained the following entries: "To set up preferred stock dividends for 1941 and 1942, charge interest $18,000.00, credit Bowersock Trust $18,000.00".

In its income tax return for the fiscal year ended May 31, 1943, petitioner reported $36,000.00 as "total disbursements to stockholders charged to earned surplus during the taxable year". The claim for refund, filed August 10, 1944, was based upon the grounds that the $36,000.00 represented interest on indebtedness. The parties agree, however, that only $18,000 paid during the taxable year ended May 31, 1943, is involved in this suit.

Throughout the course of this litigation, the petitioner has taken the position that the purpose and legal effect of these two contracts, when construed together, is not to change the substance of the original obligation, but to change it in form only to subordinate it to general bank credit; that since for tax purposes we must look to substance and not form, we must consider the payments under the contract as interest upon a fixed indebtedness.

The Tax Court reasoned that although the two agreements were entered into on the same day as a part of the same transaction, the second agreement between the common stockholders and the Trust was merely a contract for the sale and purchase of the preferred stock, and the provisions of that contract were not relevant factors in determining the intention of the petitioner and the trust in the first contract; that no extrinsic evidence satisfactorily shows

that the execution of one contract was dependent upon the execution of the other, and if by inference the evidence might so indicate, it would not, without more, establish the two contracts as an integrated and indivisible transaction. Taking the first contract as the basis for its decision, the court pointed out that the contract referred to the obligation as preferred stock on which dividends were payable only out of net earnings; that there was no maturity date on the stock, and that the preferred stockholders were entitled to limited voting rights, all of which are marked indicia of stock ownership rather than an indebtedness.

The parties apparently agree, as indeed we do, that if the preferred stock is to be construed strictly according to its terms and the contract between the corporation and the Trust, without regard to the second contract, it must be held to create an investment, not an indebtedness, and the judgment of the Tax Court should be affirmed. It is only when we consider the total obligation under both contracts that difficulty arises in determining tax liability.

■ Prior to these transactions, the parties stood on the basis of debtor and creditor, and manifestly the creditor had no disposition to become an investor in the enterprise. Thus, the expressed intention of the parties was to change only the form of the indebtedness by subordinating it to bank credit. In determining whether, in the last analysis, the parties actually accomplished their expressed intention, we think it not inappropriate to look at the entire transaction between the parties and their privies.

■ True, the corporation which issued the preferred stock was not a party to the second contract, and in a literal sense the contract imposed no enforceable obligation upon the corporation with respect to the stock. Furthermore, if the effect of the second contract was merely to guarantee the performance of the first, it does not, without more, alter or affect the legal relationship created by the first contract. But actually, and in a very real sense, the corporation was the common stockholders —the Jackman family—and whether viewed as a corporate or common stockholders' obligation, it remained essentially the obligation of the Jackman family to the Bowersock Trust. Cf. Brush-Moore Newspapers, Inc., v. Commissioner, 37 B.T.A. 787. They designedly undertook to discharge that obligation by two contracts— one with the corporation, the other with its common stockholders. And, while the parties were not strictly the same, each was privy to the other. They were executed contemporaneously in furtherance of a common and agreed purpose to impose a common obligation upon one party, i. e., the corporation. We think the contract with the common stockholders bound the corporation quite as effectively as if it had been a formal party to it. Viewed in this light, the two contracts should be construed together as one integrated writing in determining the taxable character of the obligation they impose. Peterson v. Miller Rubber Co., 8 Cir., 24 F.2d 59, 62; Williston on Contracts, § 628, p. 1801; Restatement, Contracts, § 235, p. 319.

■ In determining whether by their transaction the parties have changed their relationship from that of a debtor and creditor to a stockholder, we should consider whether the parties intended thereby that the Trust should become interested in the corporate venture, taking a risk of loss and enjoying the chances of profit. United States v. Title Guarantee & Trust Co., 6 Cir., 133 F.2d 990. Although every case turns on its own facts, the courts have pointed out some of the indicia which mark the distinction between the debtor and creditor and stockholder relationship, such as the name given to the obligation; whether the holders have voting powers, and whether there is a fixed rate of interest. All of the courts agree that the most important, if not the controlling factor, is whether the obligation provides for certainty of payment of a fixed sum on definitely fixed dates. Washmont Corporation v. Hendricksen, 9 Cir., 137 F.2d 306; First Mortgage Corporation v. Commissioner, 3 Cir., 135 F.2d 121; United States v. Title Guarantee & Trust Co., supra; Jewel Tea Co., Inc. v. United States, 2 Cir., 90 F.2d 451, 112 A.L.R. 182; Helvering v. Richmond, F. & P. R. Co., 4 Cir., 90 F.2d

971; Commissioner of Internal Revenue v. Proctor Shop, 9 Cir., 82 F.2d 792; Commissioner of Internal Revenue v. O. P. P. Holding Corporation, 2 Cir., 76 F.2d 11; Mertens Law of Federal Income Taxation, Vol. 4, Sec. 26.10.

[5] In our case the security was denominated preferred stock; it provided for accumulated interest payments to be paid only from earnings of the Company; there was no definite maturity date provided on the face of the certificate or in the first contract, and the holders of the certificates were given only limited voting rights. Implicit, however, in the whole transaction was an intention on the part of the preferred stockholders not to assume the risk of loss or the chance of profit, but rather to provide a definite date or dates on which they could enforce the payment of a fixed obligation. To effectuate this intention, the second contract guaranteed the interest dividends on the stock, and provided for the payment of the obligations of the stock in definitely fixed amounts on definitely fixed dates, in default of either or both or which the so-called preferred stockholders became owners of the corporation as effectively, if not more so, than by foreclosure under the deed of trust. The bundle of rights which the stockholders held by virtue of the two contracts preserved unto themselves all of the rights which they possessed as bondholders, except their agreement to become subordinate to operating credit. We do not suppose that a first mortgagee loses his status as a creditor because he elects to subordinate his security to other indebtedness on condition that if his indebtedness is not paid when due, he thereby automatically becomes the owner of the mortgaged property, subject to the intervening indebtedness. We think the situation is not materially different here.

When the whole transaction is viewed in the light of actualities, it is clear that the preferred stockholders remained creditors of the corporation, and that the payment on the obligation was deductible as interest. The judgment is reversed.

HUXMAN, Circuit Judge (dissenting).

I think the decision of the Tax Court is correct and should be affirmed. I agree that the two contemporaneous contracts must be considered together and for the purpose of this opinion they will be so considered. When the opinion of the Tax Court is considered in its entirety, it appears that it did consider both contracts in reaching its conclusions. It gave no effect to the contract between the Bowersock Trust and the Common Stockholders because it was of the opinion that it threw no light upon the new relationship existing between the Trust and the company after the execution of their contract of January 1, 1939. With this conclusion, I agree.

Prior to the execution of the contract in question, the Bowersock Trust was not only a creditor of the company but it was, in fact, the first preferred creditor thereof. With this outstanding preferred debt, the company was unable to obtain the banking credit it needed in its business affairs. In order, therefore, for the company to obtain the banking credit necessary to carry on its business, it was necessary for the Trust to give up this preferred creditor status. It was to accomplish this that the agreement of January 1, 1939 with the company was executed. This contract is clear and unambiguous and we must therefore look to it to determine whether thereafter the status of the Trust was that of a creditor or whether it became a stockholder. That the Trust intended thereafter to maintain the status of a creditor is beside the point. The sole and only question is what relationship did the parties spell out in their written contract. The contract with the stockholders is important only if and as it modifies the relationship created in the first contract.

It is true that the mere fact that preferred stock was issued may not in all cases be sufficient to establish a stockholder relationship rather than a debtor-creditor relationship. See Arthur R. Jones Syndicate v. Commissioner of Internal Revenue, 7 Cir., 23 F.2d 833. The facts in that case are, however, quite different from those in this case. No written contract specifically setting forth the transaction between the parties was executed, neither was an existing debtor-creditor relationship involved. Preferred shares were issued

which differ materially from the ones in this case.

The preamble clause of the contract between the Trust and the company recited the existing debtor-creditor relationship, the necessity for the release of this indebtedness, the desire to change the form of the indebtedness so the mortgage could be released, the proposal that 5500 shares of preferred stock be issued in payment of the principal of the bonds and the release of the mortgage, and that 500 shares of such stock be issued in payment of the deferred interest.

The contract recited that it was agreed that 6000 shares of such stock should be issued; that the stock should provide that it would be preferred both as to dividends and assets; that such stock should have voting rights as to the sale, mortgage or pledge of the fixed assets of the corporation, the dissolution, discontinuance, merger or consolidation with any other corporation, any amendments of or change in the charter of incorporation, or any action taken to effect the reorganization pursuant to the bankruptcy laws or relating to the appointment of a receiver. As to all of these matters, the Trust, as the owner of this stock, had equal voting rights with the common stockholders. The stock was made retirable at par and accrued dividends on call of the corporation. It was also provided that no debenture bonds, mortgage or other fixed liens should be issued by the company without the consent of the preferred stockholders; that no dividends should be paid on the common stock until all dividends, current or accumulated, if any, had been paid on the preferred stock. It further provided that if in any year dividends in excess of three per cent were declared on the common stock, one-half of such excess should be paid on the preferred stock as an additional dividend. The contract provided that when the company had performed these agreements and had delivered preferred stocks containing these recitals, the Trust agreed to cancel and surrender its first mortgage bonds in the amount of $550,000.00, and release the mortgage securing the same of record. Pursuant to the terms of the contract, the Trust cancelled and surrendered its bonds, released its mortgage and accepted the preferred stock in lieu thereof.

It must be conceded that the effect of the contract between the Trust and the company was to abolish the debtor-creditor relationship existing between them and to substitute therefor a stockholder relationship. If a debtor-creditor relationship existed between the parties thereafter, such relationship must be sought and found in the provisions of the contemporaneous contract between the Trust and the common stockholders of the company. In this contract, the Trust agreed to sell and the common stockholders agreed to purchase the 6,000 shares of preferred stock which the Trust had received from the company in payment of its bonded indebtedness. The stockholders agreed to purchase this preferred stock beginning January 1, 1944, at an agreed price so that the annual payment to the Trust of dividends on the stock and purchase price thereof would amount to not less than $31,500.00 per year. It was agreed that the common stockholders should not become personally liable but they, in effect, did agree to hypothecate all their common stock in the company with a trustee to be held upon condition that if the company had not retired enough of its preferred stock [1] at the beginning of each year to pay the Trust $31,500.00, and if the common stockholders, thereafter, for a period of six months failed to purchase the preferred stock of the Trust as provided for in this contract, then their common stock should upon demand of the Trust be delivered to it by the trustee as liquidated damages. If, thereafter, the common stockholders failed to redeem the stock as provided for in the contract, the Trust became the absolute owner of all the common stock.

The second contract was solely between the common stockholders and the Trust. The company was not a party to it. It neither assumed any liabilities nor obtained any benefits thereunder. The Trust could

---

[1] As noted, the preferred stock certificates gave the company the option to retire the stock at any time.

910

make no demand on the corporation by virtue of any of the terms or provisions of this contract. The sole purpose of this contract was to make sure that the Trust would receive $31,500.00 per year, either from the company by its voluntary retirement of this preferred stock or from the common stockholders under their agreement to purchase this stock from the Trust to this extent, if the company failed in any year to redeem preferred stock in the amount of $31,500.00. I think the Tax Court was correct in not giving any effect to the second contract in determining the relationship between the Trust and the company because it had no bearing thereon.

In short, here was the situation. A creditor-debtor relationship existed between the Trust and the company. The Trust was a preferred creditor, having a first mortgage on the assets of the company. This placed it in a strong position. This debtor relationship was also beneficial to the company for income tax purposes, but that relationship also embarrassed both parties in that it impaired the company's credit standing. In order then to improve the credit standing of the company, it became necessary to wipe out this relationship. The Trust was willing to do this but it was not willing to surrender any of the bundle of rights which it held. Realizing that it must surrender them as against the company, it entered into a contract with a third party, the common stockholders, in which they gave it all the rights it had relinquished to the company to the full extent of the entire issue of the common stock. The company likewise was willing to abolish the debtor-creditor relationship and substitute a stockholder relationship instead for the credit benefits which would result. Having received these benefits which followed the establishment of the stockholder relationship and after having obtained the credit it needs, it then wants to lay aside this cloak and again enshroud itself in the garb of a debtor when it comes time to file its income tax return. This, it may not do. No one has yet been able to devise a scheme by which one may eat his cake and yet have it.