**JORDAN CO. v. ALLEN, Collector of Internal Revenue.**

**Civ. A. No. 537.**

United States District Court
M. D. Georgia, Macon Division.

Aug. 4, 1949.

J. Q. Davidson, Swift, Pease, Davidson & Chapman, Columbus, Georgia, Bertram S. Boley, Atlanta, Georgia, for plaintiff.

John P. Cowart, U. S. Atty., Macon, Ga., T. Reese Watkins, Asst. U. S. Atty., Ma-

con, Ga., C. Moxley Featherston, Fred S. Gilbert, Sp. Assts. to Atty-Gen. (Theron Lamar Caudle, Asst. Atty. Gen., Washington, D. C., Andrew D. Sharpe, Rhodes S. Baker, Jr., Sp. Assts. to Atty-Gen., on the brief), for defendant.

DAVIS, District Judge.

The Jordan Company is a corporation organized principally for the purpose of engaging in real estate business. The Company was incorporated under the laws of the State of Georgia on October 8, 1903 with an authorized capital stock of $100,000 and the privilege of increasing said amount to $500,000. The original charter contained the following provision pertinent to the decision of this case:

"In addition to the usual power to borrow money and to otherwise create obligations, the corporation requests the power to issue a form of obligation in the nature of certificates of indebtedness to the extent of One Hundred Thousand Dollars, which shall be known as 'Debenture Stock', and which may be issued in denominations in not less than One Hundred Dollars, and in multiples of that amount, without authority to participate in the management or control of the affairs of the corporation except as specifically set forth in this section.

"The debenture stock may be sold for cash or for property or assets purchased by the corporation at the fair market value thereof. Such debenture stock, or any part thereof, may be issued in exchange for stock, bonds or other obligations of any stock corporation, domestic or foreign, now existing or hereafter organized, except of money corporations, provided the same is not in violation of the Constitution and Laws of this State.

"The debenture stock hereby authorized to be issued shall be and remain an obligation of the corporation, repayable at the expiration of the corporate existence, and entitled mean time to interest at a rate not exceeding six per centum per annum, payable quarter-yearly as an expense of the business from and out of the profits of the company, before any dividend can be declared or paid on the stock or share capital.

No payment of interest can or shall be made on such debenture stock which will impair the capital, nor unless the amount paid shall have been actually earned by the company.

"The holders of debenture stock shall not be entitled to demand or sue for the interest payable upon the obligations held by them, unless such interest was actually earned by the Company, in which event the amount earned shall be distributed amongst and paid to the holders of debenture stock in proportion to their holdings, but the unpaid interest shall, notwithstanding, become and remain an obligation of the Company payable out of any future profits to the full extent of the amount represented by the outstanding certificates, before any dividend can be declared or paid on the stock or share capital.

"In the event of the dissolution or winding up of the Company, the holders of debenture stock or certificates representing the ownership thereof, shall rank pari passu with other unsecured creditors of the corporation, and shall be entitled to receive in full out of the assets of the company the amounts represented by the outstanding certificates of indebtedness or debenture stock, in priority of the claims of stockholders to be paid any amount with respect to such shares.

"Neither the Company nor its shareholders shall have power to mortgage the property or franchises of the Company, except by the written consent of the registered owners of at least nine-tenths in amount of the outstanding debenture stock, except the Company may, without such consent, purchase property subject to mortgage, and may assume payment of such mortgages, or may execute purchase money mortgages on specific property acquired by it."

On June 18, 1940, the first meeting of stockholders was held with G. Gunby Jordan, O. S. Jordan and Ralph C. Jordan subscribing to all of the stock which was issued, being $100,000 of common stock. At this same meeting the shareholders authorized the directors to issue $40,000 of debenture stock by a resolution which referred to said stock as a "form of obliga-

tion in the nature of certificates of indebtedness". Immediately thereafter, the shareholders adopted by-laws containing provisions for the issuance of debenture stock, which provisions were similar to those in the charter. In addition, the by-laws prescribed the form of the certificate which should be issued to the holders of debenture stock.[1]

This certificate conformed substantially with the provisions set forth in the charter, with one very significant exception. Whereas the charter provided that the holders of debenture stock should rank pari passu with general creditors upon dissolution, the certificate as set out in the by-laws (and as subsequently issued to the holders thereof) provided that upon dissolution the holders of debenture stock should rank after the general creditors, equally with each other and prior to the holders of common stock. The by-laws further provided

---

[1] Form of Certificate and Blank Transfer on reverse side.

(Shares $100 Each)

————————————— Shares

No. ————————————

(Total authorized Debenture Stock, $100,000)

Incorporated under the laws of the State of Georgia

This Is To Certify That

THE JORDAN COMPANY

Hereby acknowledges itself indebted to ———— in the sum of ———— Dollars, payable at the expiration of the Corporate existence, in gold coin of the United States of America, at present standard weight and fineness, represented by ———— shares of Debenture Stock of the Company, of the par value of One Hundred Dollars per share, being part of a total authorized issue of One Hundred Thousand Dollars of Debenture Stock.

Each of the shares of Debenture Stock represented by this Certificate is entitled to receive interest at the rate of six per cent. per annum, payable quarter yearly, on the first of January, April, July and October in each year, from and out of the profits of the Company before any dividend can be declared or paid on the stock or share capital, but no payment of interest can or shall be made on such Debenture Stock which will impair the capital, nor unless the amount paid shall have been actually earned by the Company.

In the event of default in payment of the interest on the Debenture Stock represented by this certificate, the unpaid interest shall become and remain an obligation of the Company, payable out of any future profits, to the full extent of such unpaid interest, before any dividend can be declared or paid on the stock or share capital.

In the event of the dissolution or winding up of the Company, the creditors of the Company other than the holders of Debenture Stock, shall be first paid out of the assets of the Company and after the payment of the general creditors, the holders of Debenture Stock shall rank equally with each other and prior to the holders of the common stock of the Company; and neither the Company nor its shareholders shall have power to mortgage the property or franchises of the Company except by the written consent of the then registered owners of at least nine-tenths in amount of the outstanding Debenture Stock.

The holders of nine-tenths in amount of the outstanding Debenture Stock may at any time after two years and not more than twelve years, from the organization of the Company, procure the conversion of the entire issue of Debenture Stock then outstanding into preference shares of the Company, entitled to a cumulative dividend of six per cent. per annum, payable quarter-yearly and preferred over the common stock as to capital as well as dividend.

This certificate is subject to such restrictions as may be imposed by the Charter and by-laws of the Company.

Witness, the corporate seal and the signature of the President and Treasurer at the City of Columbus, this ———— day of ———— A.D.

(Blank Transfer Form on Reverse Side)

Notice—The signature to this assignment must correspond with the name as written upon the face of the certificate in every particular, without alteration or enlargment or any change whatever.

For Value Received,—hereby sell, assign and transfer unto ———————— Shares of the Capital Stock represented by the within Certificate, and do hereby irrevocably constitute and appoint ———————— Attorney, to transfer the said stock on the books of the within named Company, with full power of substitution in the premises.

Dated ————————————

in presence of

————————————

that the debenture stock should conform to charter requirements and the certificate itself stated that it was subject to such restrictions as might be imposed by the Company's charter and by-laws.

After adopting the by-laws, the shareholders elected directors and authorized them to invest all of the corporate assets ($100,000.) in two pieces of property, one of which was purchased subject to a lien or mortgage in the amount of $3,000.

The $40,000 of debenture stock authorized at this meeting was issued following a resolution of the Board of Directors dated October 13, 1905. The certificates issued to the purchasers thereof were identical with the form prescribed in the by-laws.

On October 1, 1916, the stockholders individually authorized the issuance of the remaining $60,000 of debenture stock permitted by its charter. At a meeting of the stockholders on February 7, 1917, this unanimous verbal authority was confirmed and ratified by a resolution approving and confirming the already completed sale of an additional $10,000 of said stock, and instructing the Treasurer to issue and sell any part or all of the remaining $50,000 of said stock.

At a stockholders' meeting on February 13, 1918, it was reported that 74 shares of debenture stock were held by persons other than owners of common stock in the Company. In view of the fact that the war eliminated any reasonable "hope for early use of its funds as loans to builders", it was decided to retire the debenture stock. The minutes of the meeting state that the stock would automatically mature in 1924. The resolution adopted authorized the holders of common stock to exchange their debenture stock for additional common stock, and authorized the Company officials to purchase all other debenture stock on either April 1 or July 1, 1918 at $103 per share plus all accrued interest. Said resolution further empowered the officials to accept from such debenture stockholders, as a loan for a period not to exceed one year, at six per cent. interest, an amount not to exceed the avails of the debenture stock so sold to the corporation.

In accordance with the resolution so adopted, the entire issue of debenture stock outstanding was retired in 1918.

On February 7, 1923 the charter of the Company was amended to extend the life of the corporation for a period of twenty years commencing October 8, 1923 and to allow the corporation to increase its capital stock, as desired, to any amount not exceeding $2,000,000.

The second issue of debenture stock, which is the one with which we are presently concerned, was authorized at a meeting of the stockholders on January 16, 1925. The Directors had recommended the new issue of $100,000 of debenture stock. The resolution adopted stated that the Directors deemed it a proper time to sell and issue the chartered limit of such stock and authorized and directed the officers to sell said stock. It further provided that the debenture stock should bear interest not to exceed 6 per cent. and should be offered at par and interest. The officers were empowered to accept payment in cash or 40 per cent. cash and 60 per cent. deferred payments due within one year and represented by notes or evidences of indebtedness, all deferred payments to bear interest of not less than six per cent. If unpaid after 12 months, the note or evidence of indebtedness should bear interest at 8 per cent., which should be stated in the body thereof. The Company officials were also authorized to pay a brokerage fee of one per cent. to actual brokers for the sale of stock. The resolution provided also that certificates issued to the holders should carry on their face the following provision: "After thirty days notice to the holder, this certificate is redeemable on any interest date at $105 per share together with all unpaid accrued interest thereon."

After the authorization of the 1925 issue, the full amount of debenture stock authorized by the charter was sold. The certificates issued to the holders were identical with those issued in 1905, except for the above quoted provision which was printed across the face of each certificate in red ink.

The Company paid the "interest" on the debenture stock regularly. Prior to 1940 a portion of this issue was retired and during the years 1940, 1941, 1942, 1943 and 1944 the debenture stock remaining outstanding amounted to $97,100. During each of the taxable years ending on December 31st of each of the above mentioned years, the company paid to the holders of said debenture stock amounts aggregating $5,826. The Company deducted the sum of $5,826 as interest paid on outstanding obligations for each of the taxable years ending December 31, 1940, 1941, 1942, 1943 and 1944. These deductions were disallowed by the Commissioner on the grounds that they were payments of dividends rather than payments of interest and the deficiency assessments resulting from such disallowance were made. On October 30, 1945, the Company paid to Marion H. Allen, as Collector of Internal Revenue, taxes and interest, due as a result of the disallowance in the amount of $9,643.75. On December 27, 1946 the corporation filed its claim for refund. Six months having elapsed without action by the Commissioner, the Company filed this suit.

Subsequent events, while not here involved, do shed some light on the nature of the instruments under consideration. In 1943, the charter of the Company was extended for a period of 35 years from October 8, 1943. The testimony of two of the officers of the corporation revealed that this 1925 issue of debenture stock was retired in 1947 upon payment of $105 for each $100 certificate plus all accrued unpaid interest thereon. They further testified that in their opinion the debenture stock matured in 1945, but desiring to retain the funds, one of the officers was directed to canvass some of the larger holders to learn their reaction to a proposal to postpone retirement of the debenture stock. Mr. G. Gunby Jordan II approached the holders of most of the certificates and learned that they desired to "have that investment in their portfolio, as long as possible." The officials testified that this was the reason the issue was not retired in 1945 when they considered it to mature.

The President, Vice-President and Treasurer of the taxpayer also testified that they always considered the debenture stock as an indebtedness and the payments made thereon as interest. They and the bookkeeper further testified that the debenture stock and the quarterly payments were thus treated on the books of the company. The audits of the company books, however, show no definite treatment. The balance sheet in some years lists the stocks as a liability; in others the audit lists the holders thereof with the holders of common stock, and in most years carries the debenture stock as a kind of hybrid, listing it between items entitled "Liabilities" and those, such as capital stock, listed under "Net Worth and Surplus".

While the corporate officials testified that they treated the payments made on these certificates as interest, in the body of the preferred stock certificates issued by the Company, the payments to be made on the debenture stock are referred to as "dividends".

Though there was testimony as to the corporate officials' treatment of the certificates and the payments made thereon, there was a noticeable lack of evidence as to the manner in which the certificates were treated by any holders who were not corporate officials.

During the years in question all but approximately 375 shares of the debenture stock were held by holders of the Common Stock in the company or members of their families.

The sole question involved in this case is whether the payments made to the holders of the Debenture Stock of The Jordan Company in 1940, 1941, 1942, 1943 and 1944 were in fact payments of interest on outstanding obligations as contended by the taxpayer or dividends paid on invested capital as determined by the Commissioner. If the payments were actually interest, they are deductible under Section 23(b) of the Internal Revenue Code, 26 U.S.C.A. § 23(b). On the other hand, if they were in fact dividends, they are not deductible.

Generally speaking, those securities which we have come to consider as typical

stocks and typical bonds are readily distinguishable. But with the increasing complexity of business organization has come an ever growing number of securities which fall between the extremes represented by the typical stocks and bonds. These issues have features common to both stocks and bonds and virtually defy positive classification.

Because of the aforementioned provisions of the Internal Revenue Code, the application of the appropriate label to these hybrid securities has assumed an unusual significance. As would be expected, many cases have turned on precisely this question. Throughout all of these cases, however, the courts have consistently stated that each such case must turn on its own peculiar facts. John Kelley Co. v. Commissioner of Internal Revenue, 326 U.S. 521, 60 S.Ct. 299, 90 L.Ed. 278. Consequently, no single hair-line rule has or can be used for the determination of the issue here involved.

■ In general, the cases hold that the answer depends on what the payments in fact are. As decided by the Fifth Circuit and consistently followed by other courts, the question is " 'not what the payments are called, but what in fact, they are'; and that if the evidence taken as a whole shows a relation of debtor and creditor, 'the payments made on account of that relation, will be interest, no matter how called, while if taken as a whole, the evidence shows a stockholding relation, the payments made will be dividends, equally no matter how called.' " Commissioner of Internal Revenue v. J. N. Bray Company, 5 Cir., 126 F.2d 612, 613; U.S. v. South Georgia Rwy. Co., 5 Cir., 107 F.2d 3; United States v. Title Guarantee & Trust Co., 6 Cir., 133 F.2d 990.

While the above quoted statement is the one most uniformly used by all of the courts, it does not greatly facilitate the decision of the true issue. It is merely a signpost pointing out the real question involved. The solution remains a difficult one. This fact is emphasized by the great number of cases, including the present one, in which counsel for both litigants cite with approval and base their case on the rule above enunciated. Parisian, Inc. v. Commissioner of Internal Revenue, 5 Cir., 131 F.2d 394.

■ Though the courts have refused to lay down a precise formula to be applied, they have repeatedly set forth certain factors or criteria which they considered significant in arriving at the true nature of the securities involved. While most courts stress the same factors, no one has been relied on as a determinative factor. Those usually considered include: 1. Treatment by the parties; 2. Maturity date and right to enforce collection; 3. Rank on dissolution; 4. Uniform rate of interest payable or income payable only out of profits; 5. Participation in management and the right to vote.

■ The criteria above listed, though generally mentioned in the cases, are clearly not of equal importance. The question of voting rights and a voice in the management of the company has frequently been discussed but has never been stressed in determination of the issue. Naturally, if the security holders had such rights, this would strongly indicate that the securities were stocks. The absence of voting and managerial rights or the presence of only extremely limited rights, however, is of little probative value, since it is common both to bonds and preferred stock. Commissioner of Internal Revenue v. H. P. Hood & Sons, Inc., 1 Cir., 141 F.2d 467.

■ The next factor to be considered, and the only one of significance in this case which is in any wise favorable to the taxpayer, is the treatment accorded the issue by the parties. The evidence on this point is in some conflict but the preponderance of it supports the contention that the Company itself treated the debenture stock as an obligation and the payments thereon as interest. Except for the statement of one of the corporate officers who was also a holder of debenture stock, there was no evidence as to how the holders of the stock treated it and the payments on it. Admitting, for the purpose of this decision, that the parties so treated it, this cannot be suf-

ficient to justify the taxpayer's position. Clearly this factor alone is not, and has never been held to be, sufficient basis for determining the question in this case. To so hold would be to furnish taxpayers with a blueprint for tax avoidance by the simple expedient of using the proper nomenclature and bookkeeping entries.

The other factors to be considered are the ones generally held to be of the greatest significance. All of them clearly indicate that the issues here involved were cumulative preferred stock and not bonds or obligations.

In general, the holders of obligations are general or secured creditors of the corporation and rank as such on dissolution. In this case, the holders of the debenture stock, by the provisions of the debenture certificates, ranked ahead of the other stockholders but inferior to general creditors. It was urged by the taxpayer that this provision in the certificate was not controlling in view of charter and by-law provisions that the holders of debenture stock should rank pari passu with the general creditors of the corporation. This position, however, is not tenable. The nature of the contract in this respect is to be determined from the clear and unequivocal language of the agreement. We look to the charter and by-laws merely to ascertain whether the corporation had the authority to issue such securities. Clearly, the authority to issue debenture stock giving the holders certain prescribed rights against the corporation includes the authority to issue debenture stock giving more restricted rights to the holders. Debenture stock certificates, purporting to confer additional and more inclusive rights, might be ultra vires in the face of charter and by-law provisions, but this is not the case here. For this reason, it is beyond dispute that the holders of the debenture stock here involved could only participate in the assets of the corporation, on dissolution, after the full satisfaction of all general creditors. While not of itself decisive, this is one factor strongly indicating that the holders were sharing in the risk of the venture in a manner more compatible with the status of stockholders than creditors. As stated in Helvering v. Richmond, F. & P. R. Co., 4 Cir., 90 F.2d 971, 974, "While no comprehensive rule may be laid down for distinguishing in all cases between an investment in a corporation and a loan to it, one of the most important considerations is whether the right to share in the assets of the corporation in case of dissolution is subject to the rights of creditors. If subject to such right, there is a strong presumption that the interest in question is that of a stockholder."

This position is further fortified by the provisions for the payment of interest at a prescribed rate to be paid only out of profits. It is true that the unpaid interest was cumulative and, in accordance with the charter, by-laws, and certificate provisions, was to be considered a subsisting obligation. This fact, however, loses much of its significance when considered in connection with the provision that holders of debenture stock should rank inferior to general creditors. These provisions with respect to the payment of interest, when so considered, are those usually included in preferred stock certificates and are rarely incidents of true obligations.

Finally, and of utmost significance, is the question of maturity date and the right to enforce payment of the principal sum by some appropriate legal remedy. The Fifth Circuit has repeatedly held that the existence of a fixed maturity date for the principal sum, together with a right to enforce payment of said sum as a debt in case of default, is the most significant, if not the essential feature of a debtor and creditor as opposed to a stockholder relationship. U. S. v. South Ga. Ry. Co., 5 Cir., 107 F.2d 3. This view has been upheld in other jurisdictions. Jewel Tea Company v. U. S. , 2 Cir., 90 F.2d 451, 112 A.L.R. 182; Commissioner of Internal Revenue v. H. P. Hood & Sons, Inc., 1 Cir., 141 F.2d 467. As stated by the Fourth Circuit in Brown-Rogers-Dixson Co. v. Commissioner of Internal Revenue, 122 F.2d 347, 350, in which the certificate was almost identical with the one here involved, "it has been repeatedly held that one of the

F.Supp. 437

fundamental characteristics of a debt is a definite determinable date on which the principal falls due." In the Hood case [141 F.2d 470], cited above, the court said that the existence of a fixed maturity date at which time the holder could demand payment regardless of net earnings was "the essential feature of the debtor-creditor relation."

In this case, the obligation set forth in the debenture stock certificate clearly had no maturity date. There was no time set forth in the certificate or prescribed in the charter or by-laws at which the holders could demand payment of the principal sum. Nor was there any method provided by which such payment could be forced. As was said by Judge Learned Hand in the Jewel Tea Case, supra [90 F.2d 453], "there was no time fixed when the holders could demand their money; they were at the mercy of the company's fortunes and payment was merely a way of distributing profits."

It is true that the company officers testified that they considered that the debenture stock matured after twenty years. This, however, is not significant. Mere opinion of corporate officials cannot override the provisions of the certificates themselves and the charter and by-law provisions authorizing this issue. Clearly, it would not give the holders of the debenture stock legal grounds for claiming that the principal sum was due at a definite time. For it to be claimed that there is a maturity date, there must be some time set in advance at which the principal sum becomes due and it cannot be left within the power of the company to fix such date subsequently.

There is still another argument against the theory that the debenture stock matured after twenty years and was so considered by the officers. The second issue was authorized in 1925 and, according to the officials, matured in 1945. Yet, when this issue was retired, after the corporate officers considered it matured, they retired it at a premium. Payment of premiums is certainly more consistent with retirement of stock than with payment of past due obligations.

The claim that by the terms of the certificate the obligation matured upon the termination of the corporate existence and, therefore, had a "maturity date" is also untenable. Under the Georgia law, corporate existence could be renewed for successive periods of 20 years at any time prior to 1938 and since that time, it may be extended for successive periods of 35 years ad infinitum. Georgia Code, Ann.Supp. Section 22-1871. Thus, should termination of the corporate existence be considered the maturity of the debenture stock, it would not be a fixed or determinable date set in advance but could constantly be moved forward simply by corporate action.

The officials claimed that they considered the maturity date of the debenture stock to be twenty years from the date of its authorization. That is, the 1904 issue matured in 1924 and the 1925 issue matured in 1945. Yet, they also argue that they considered the maturity date to be the date of the expiration of the corporate existence. This would have been consistent had the issues of debenture stock coincided with the granting of the corporate charter and the amendment thereto. But the original charter would have expired in 1923 but for the amendment extending it to 1943. Clearly, the officers could not have considered the first issue as maturing both in 1923 and 1924, and the second issue both in 1943 and 1945. Thus, their own ideas on the subject are conflicting and confusing. They obviously cannot serve to supply a maturity date where there was none.

The rule of the South Georgia Railway Case, supra, clearly shows the importance which the Fifth Circuit places on the absence of a maturity date. It is interesting to further note that the Fifth Circuit has never once construed an instrument as an obligation in the absence of a maturity date. While no court has squarely held the absence of a maturity date to be absolutely controlling, there is an abundance of authority to the effect that the absence of a maturity date, the obligation to pay income only out of profits, and the subordination of the holders of debenture stock to the general creditors renders payments made thereon

more like dividends on preferred stock than interest on bonds. Commissioner of Internal Revenue v. Schmoll Fils Association, Inc., 2 Cir., 110 F.2d 611; May Hosiery Mills, Inc. v. Commissioner of Internal Revenue, 4 Cir., 123 F.2d 858.

The absence of a maturity date and the right to enforce payment of the principal sum by legal action, when considered in connection with the other factors above outlined, leads the court to the conclusion that the securities here involved were stocks and not obligations.

None of the cases cited by the taxpayer are contrary to this holding. The Commissioner of Internal Revenue v. National Grange Mutual Liability Co., 1 Cir., 80 F. 2d 316, one of the few cases construing the securities involved as obligations in spite of the absence of a maturity date is easily distinguished. In that case, "the absence of a maturity date in the 'guaranty units' was due to the necessary requirements of the mutual insurance business in which the taxpayer was engaged." Commissioner of Internal Revenue v. Schmoll Fils Association, Inc., supra [110 F.2d 613]. The National Grange Case was one of the earlier cases on this question and, as Judge Augustus Hand remarked in the Schmoll Fils Association Case, the opinion in that case did not refer to the Second Circuit's previous opinion in Commissioner of Internal Revenue v. O. P. P. Holding Company, 76 F.2d 11, wherein was stressed the importance of a maturity date, but commented instead on the utter lack of any authority on the question.

Other cases relied on by the taxpayer are also easily distinguishable.

In the case of The Commissioner of Internal Revenue v. O. P. P. Holding Company, 2 Cir., 76 F.2d 11, 12, one of the cases relied on by the taxpayer, the bonds involved had a definite maturity date, though this date could be extended by vote of two-thirds of the outstanding bonds. There was, however, a date on which the holders could demand payment unless they themselves or two-thirds of them took some affirmative action. This is quite different from a case where the company reserves to itself the right to continually postpone the maturity of the obligation. In that case, the court said, "The fact that ultimately he (the holder) must be paid a definite sum at a fixed time marks his relationship to the corporation as that of creditor rather than shareholder." Thus, while the ultimate decision was with the taxpayer, the reasoning of the court did not support the contentions here made by the taxpayer.

Two other cases cited by the taxpayer, Third Scottish American Trust Co. v. U. S., 93 Ct.Cl. 160, 37 F.Supp. 279, 281; and Helvering v. Richmond, F. & P. R. Co., 4 Cir., 90 F.2d 971, involved securities which had no definite maturity date so long as the company did not default in the payment of interest. In both cases, the company was required to pay interest whether or not there were profits, and on any default the holders were given certain means of enforcing payment of both principal and interest. In the latter case, the holders were given a lien on the assets of the company which they could foreclose in case of a default and the proceeds therefrom could be applied to the payment of both principal and interest. Both of the decisions above cited relied heavily on the fact that payments of interest were required, even though the company had no profits, and the fact that payment could be enforced. In the former case, the holders ranked equally with the general creditors and in the latter, they ranked as secured creditors. Thus, in neither case, could it be argued that the holders of the securities were risking their capital, nor the return thereon, in the ventures of the company to the same extent as the holders of the Debenture Stock here before us. The Third Scottish American Trust Company Case expressly stated that the holder's "return was payable whether the company made profits or not, and he secured the return of his principal on a parity with other unsecured creditors of the company. Such are the characteristics of a loan to the company, rather than of a purchase of a proprietary interest in it." [93 Ct.Cl. 160, 37 F.Supp. 283.] As previously quoted, The Richmond F. & P. R. Co. Case held that if the right of the holders to share in the assets of the corporation

on dissolution is subject to the rights of creditors, there is a strong presumption that the interest in question is that of a stockholder. Thus, the Debenture Stock here considered is not similar to that involved in the cases so strongly relied on by the taxpayer and there are indications in those opinions that incline the court to believe that by the very rules laid down in those cases, this Debenture Stock must be held to represent a proprietary interest.

Most of the cases holding the securities involved to be debts or obligations were cases involving obligations which had fixed maturity dates. In many of these cases the presence of a maturity date was itself considered the deciding factor. One of the most recent cases is The Bowersock Mills & Power Co. v. Commissioner of Internal Revenue, 10 Cir., 172 F.2d 904, 907. There, the court pointed out the presence of a definite maturity date contained in a separate instrument, and said "all of the courts agree that the most important, if not the controlling factor, is whether the obligation provides for certainty of payment of a fixed sum on definitely fixed dates."

With this position I am in accord, and with the further considerations here present, feel that there can be no doubt as to the true nature of the securities here involved. They were stock and the payments made to the holders thereof were dividends and thus not deductible.

The Commissioner was correct in his determination and the Plaintiff is not entitled to recover.

The foregong shall be taken as the Court's Findings of Fact and Conclusions of Law.

### Judgment

In accordance with the Findings of Fact and Conclusions of Law contained in the opinion entered herein this day,

It is Considered, Ordered and Adjudged that the Plaintiff, The Jordan Company, take nothing from the defendant in this action.

Further Ordered that the Plaintiff, The Jordan Company, shall pay all costs incident to these proceedings.