GOODING AMUSEMENT COMPANY, INCORPORATED, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

F. E. GOODING, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

ELIZABETH GOODING (ALSO KNOWN AS ANNA ELIZABETH GOODING), PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

F. E. GOODING AND ELIZABETH GOODING (ALSO KNOWN AS ANNA ELIZABETH GOODING), PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 40039–40042. Filed November 30, 1954.

*Roger K. Powell, Esq.*, for the petitioners.
*Robert E. Johnson, Esq.*, for the respondent.

416

OPINION.

VAN FOSSAN, *Judge:* The first question is whether on or about August 24, 1946, there was created between petitioner corporation, on the one hand, and petitioners and their infant daughter on the other, a debtor-creditor relationship. If so, the judgment notes issued that day by the corporation were genuine evidences of indebtedness and the amounts accrued thereon by the corporation as interest expense and subsequently paid out in cash to the holders of the notes constituted interest on indebtedness under section 23 (b), Internal Revenue Code of 1939,[4] and, hence, proper deductions from gross income. If not, the amounts so accrued and paid were not interest and the respondent's disallowance of these amounts as deductions from the corporation's gross income should be sustained.

This is another in a long series of cases wherein the stockholders of a closely held corporation have attempted to establish between themselves and the corporation the relationship of creditor-debtor. Cf. *John Kelley Co.* v. *Commissioner* and *Talbot Mills* v. *Commissioner*, 326 U. S. 521; *Kraft Foods Co.*, 21 T. C. 513; *Tribune Publishing Co.*, 17 T. C. 1228; *Toledo Blade Co.*, 11 T. C. 1079; *Mullin Building Corporation*, 9 T. C. 350; *Clyde Bacon, Inc.*, 4 T. C. 1107, to cite only a few of the cases involving this problem. Oftentimes

---

[4] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

\* \* \* \* \* \* \*

(b) INTEREST.—All interest paid or accrued within the taxable year on indebtedness, except on indebtedness incurred or continued to purchase or carry obligations (other than obligations of the United States issued after September 24, 1917, and originally subscribed for by the taxpayer) the interest upon which is wholly exempt from the taxes imposed by this chapter.

the desire to obtain for the corporation a tax advantage is a principal motive, the tax advantage being in the fact that amounts paid out as interest on indebtedness are deductible from the corporation's gross income, whereas the same is not true of dividends paid out on stockholdings.

There is nothing reprehensible in casting one's transactions in such a fashion as to produce the least tax. The courts have often reaffirmed this view. *Bullen* v. *Wisconsin*, 240 U. S. 625; *United States* v. *Isham*, 84 U. S. 496. On the other hand, tax avoidance will not be permitted if the transaction or relationship on which such avoidance depends is a "sham" or lacks genuineness. The concept that substance shall prevail over form has likewise been enunciated in numerous cases. Cf. *Higgins* v. *Smith*, 308 U. S. 473; *Gregory* v. *Helvering*, 293 U. S. 465; *1432 Broadway Corporation*, 4 T. C. 1158.

In the light of the above considerations, the courts have undertaken to deal with the kind of question presently before us. In deciding each of these cases on the basis of its own peculiar facts, the courts have been careful not to lay down any all-embracing rule of general application. Instead they have invoked and relied upon certain criteria, none of which is, by itself, determinative of the ultimate fact question. Cf. *Bowersock Mills & Power Co.* v. *Commissioner*, 172 F. 2d 904; *Ruspyn Corporation*, 18 T. C. 769; *New England Lime Co.*, 13 T. C. 799.

In the instant case, in the matter of form, the notes in question present no problem of interpretation. The formal criteria of indebtedness are unquestionably satisfied. The notes on their face are unconditional promises to pay at a fixed maturity date a sum certain and the payment of interest thereon is not left to anyone's discretion. The instruments in form are pure evidences of indebtedness.

But we are not limited in our inquiry to the instruments themselves. We may look at all the surrounding circumstances to determine whether the real intention of the parties is consistent with the purport of the instruments. *Proctor Shop, Inc.*, 30 B. T. A. 721, affd. 82 F. 2d 792.

The most significant aspect of the instant case, in our view, is the complete identity of interest between and among the three noteholders, coupled with their control of the corporation. The noteholders were husband, wife, and infant daughter, respectively. The husband held the majority stock in the corporation. It is, in our opinion, unreasonable to ascribe to the husband petitioner, F. E. Gooding, an intention at the time of the issuance of the notes ever to enforce payment of his notes, especially if to do so would either impair the credit rating of

the corporation,[5] cause it to borrow from other sources the funds necessary to meet the payments, or bring about its dissolution. Compare, on this aspect of the case, the reasoning in *Mullin Building Corporation, supra*, at pp. 355, 356. In addition, a realistic appraisal of the family situation can lead, in our view, only to the conclusion that with regard to the disposition or enforcement of their notes petitioner's wife and daughter never contemplated acting either independently of or contrary to the wishes of the petitioner. The fact that the majority of the notes here involved, all of which have long since matured, have not been paid lends corroboration to our finding that at no time material to our consideration did the noteholders intend to enforce payment of their notes or assert the rights of bona fide creditors. If the state of mind of the noteholders was as above indicated, it is apparent that their position with respect to the amount represented by the principal of the notes was akin to that of the ordinary shareholder, who understands that his investment is subject to the risks of the venture and the prior claims of creditors. The incidence here of the subordination of the Goodings' notes to the claims of others is too marked to permit us to find that a bona fide debtor-creditor relationship was established between the corporation and its controlling stockholders.

In support of its position, petitioner corporation points to an initial financial structure that reveals no excessive ratio of debt to stock. In fact, if a reasonable value is attributed to goodwill, the portion of the assets subject to the prior claim of the alleged debt was no greater than that remaining for the stock. But the "thin capitalization" factor is only one of the indicia from which the presence or absence of a debtor-creditor relationship may be determined. We do not consider it decisive of the present issue.

It is further urged on behalf of the petitioner corporation that there were excellent business purposes behind the issuance of the notes

---

[5] At the hearing, petitioner testified as follows:

Q. So that in order to continue operating, you needed those funds and the other notes that were left in the corporation during '46 to '48?

A. Well, it was more necessary that we pay other obligations than it was those. Those were our family obligations and could be put off whereas the banks that we borrowed money from or other indebtedness that we may have had, we tried to keep those bills paid up to date and not to have a lot outstanding in order to have a good credit rating.

\*       \*       \*       \*       \*       \*       \*

Q. It didn't matter to the family whether the bills were paid or not?

A. What bills are you referring to?

Q. You said—say notes?

A. It didn't matter to the family.

\*       \*       \*       \*       \*       \*       \*

Q. So that in substance it wouldn't have mattered to your family whether the notes were paid now or maybe five years from now or whether they were paid?

A. At that particular time, no.

\*       \*       \*       \*       \*       \*       \*

in such large amounts as compared to the capital stock. Petitioner contends that since the amusement device business is constantly subject to the imposition of crippling liability as a result of accidents he desired that he and his family become substantial creditors, on a par with other unsecured general creditors, as well as shareholders of the corporation. Thus, it is argued, in the event of a disastrous accident and the ensuing heavy liability, petitioner and his family, by virtue of their status as creditors, would be able to salvage some portion of the corporate assets—a result that would be highly improbable if they were stockholders only. While the above consideration may have entered into petitioner's calculations, the record indicates that its status as a motive for the issuance of notes instead of stock was minor. It will be noted that at the close of 1942, when presumably the risk of massive liability due to accident was no less than it was in 1946, the petitioner changed from the corporate form of doing business to a partnership. If petitioner was so little concerned about the possibility of financial ruin in 1942 and 1943 that he risked doing business as a partnership, we doubt that he was much, if any, more anxious about such an eventuality in 1946, notwithstanding the disastrous Hartford circus holocaust which petitioner tells us made such an impression on him. Furthermore, the record indicates that the liability insurance carried by the corporation was more than adequate to cover any claim that might reasonably have been expected to arise against the corporation as a result of an accident.[6]

Petitioner also urges that his desire and intention to allow key employees to have stock in the corporation constituted another cogent business purpose. Such an attitude has great merit and is to be encouraged, but we are unable to agree to the conclusion implicit in the argument that a comparatively small capitalization is required to achieve this objective. Moreover, we cannot avoid the thought that an equally cogent reason for permitting employees to subscribe to approximately 24 per cent of the stock following the exchange of August 24, 1946, was to avoid, if possible, the impact of the "control" provision of section 112 (b) (5) of the Code.

Thus, we find no substantial merit in the arguments advanced by petitioner in support of his contention that nontax considerations were the significant factors in the decision to take short-term judgment notes, in addition to stock, in the newly formed petitioner corporation. What remains, therefore, is the stark fact that the only substantial purpose motivating the transaction was one of tax avoid-

[6] The face amount of the corporation's liability insurance in 1948 and 1949 was $50,000/$200,000, a figure considerably in excess of the partnership insurance policy, which petitioner testified would "go a long way" toward covering any potential liability. Note also that the largest claim ever paid on behalf of petitioner's amusement enterprises was $18,000.

ance. When this fact is considered, together with the extent to which the notes were subordinated to the claims of creditors, the reality of the amenability of petitioner's wife and infant daughter to his desires in respect of the notes, and the absence from the transaction of any true borrowing element or new contribution to the enterprise, we must conclude that no indebtedness within the meaning of section 23 (b) arose between the Goodings and the corporation. Since there was no indebtedness, the accruals in question could not represent interest. We, therefore, sustain respondent on the first issue.

The second issue is closely related to the first and involves the question whether the payments in 1947 and 1948 by the corporation on the principal amount of the notes issued to petitioners in 1946 constituted a taxable dividend under section 115 (a) or a cancellation or redemption of stock essentially equivalent to the distribution of a taxable dividend under section 115 (g) of the Code.[7]

The usual presumption of correctness inhering in respondent's determination also applies in the present instance. *George Hyman*, 28 B. T. A. 1231, affd. 71 F. 2d 342, certiorari denied 293 U. S. 570. The burden, therefore, is on the petitioner to establish by a preponderance of the evidence that the payments in question were not essentially equivalent to dividends.

The petitioners have rested almost their entire case on the proposition that the notes here involved were genuine evidences of indebtedness. We have found to the contrary and held accordingly on the first issue. The same evidence that failed to carry the day on the first issue is equally deficient with respect to the instant issue. Since the notes did not, in reality, represent creditor interests, the payments made to the stockholders who held such notes must be considered not as payments of a bona fide indebtedness of the corporation, but as distributions of corporate profits to the stockholders as stockholders and not as creditors. Therefore, we conclude that they constituted dividends under the broad language of section 115 (a). Cf. *Emil Stein*, 46 B. T. A. 135; *Houck* v. *Hinds*, 215 F. 2d 673. The corporation had accumulated earnings both before and after the payments. The proportional ownership of the stockholders was unchanged after the payments. The fact that the corporation, or rather the petitioner, may have had no intention of distributing earnings

[7] SEC. 115. DISTRIBUTIONS BY CORPORATIONS.

(g) REDEMPTION OF STOCK.—If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend.

under the guise of discharging debts is immaterial. As the court in *McGuire* v. *Commissioner*, 84 F. 2d 431, said:

Neither artifice, subterfuge, or bad faith need be present to bring a transaction within the meaning of the statute here involved, for as we read the law a taxpayer may well act with the utmost good purpose and without evil intent and yet his transactions may in effect be the equivalent of the distribution of a taxable dividend.

Nor does the fact that the payments here involved were not made pro rata among all the shareholders alter the net effect of what was done. As we said in *James F. Boyle*, 14 T. C. 1382, 1389:

Much is made of the suggested inequality of the distribution as among the stockholders. The contention is not impressive on either the law or the facts. Legally it is not alone distributions which are true dividends to which the section applies. "* * * this theory assumes that the distribution must in fact meet the legal test of a dividend to fall within section 201 (g) [the predecessor of 115 (g)]. If this were sound, that provision of the statute would be surplusage, as such a dividend would be taxable under other provisions. Cf. *United States* v. *Katz*, 271 U. S. 354. The purpose of this section is to tax distributions which effect a cash distribution of surplus *otherwise* than in the form of a legal dividend * * *." *Shelby H. Curlee, Trustee*, 28 B. T. A. 773, 782, affirmed (C. C. A., 8th Cir.), 76 Fed. (2d) 472, certiorari denied, 296 U. S. 599.

Accord, *J. Natwick*, 36 B. T. A. 866.

For the reasons above stated, we hold for the respondent on the second issue. See *Houck* v. *Hinds, supra.* It is unnecessary to decide whether or not section 115 (g) is applicable in the situation herein presented.

The last issue requires a determination as to the proper basis for the depreciable assets acquired by the corporation in pursuance of the exchange of August 24, 1946. Respondent contends that the 1946 exchange was nontaxable under section 112 (b) (5) of the Code,[2] that gain should not have been recognized as a result, and that, therefore, the assets acquired by the transferee corporation should retain the adjusted bases they had in the hands of the Goodings, the transferors. Thus, urges respondent, it was improper to use the fair market value of such assets at the time of the exchange in 1946

---

[2] SEC. 112. RECOGNITION OF GAIN OR LOSS.

  (b) EXCHANGES SOLELY IN KIND.—

    \*      \*      \*      \*      \*      \*      \*

    (5) TRANSFER TO CORPORATION CONTROLLED BY TRANSFEROR.—No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation; but in the case of an exchange by two or more persons this paragraph shall apply only if the amount of the stock and securities received by each is substantially in proportion to his interest in the property prior to the exchange. Where the transferee assumes a liability of a transferor. or where the property of a transferor is transferred subject to a liability, then for the purpose only of determining whether the amount of stock or securities received by each of the transferors is in the proportion required by this paragraph, the amount of such liability (if under subsection (k) it is not to be considered as "other property or money") shall be considered as stock or securities received by such transferor.

as the unadjusted bases for the calculation of depreciation expense and gains and losses from capital sales for the taxable year here involved.

It is the contention of the petitioner corporation that the exchange involved did not come within section 112 (b) (5), but, to the contrary, was a transaction taxable in part under section 112 (c) (1) of the Code of 1939,[9] and that, therefore, the bases of the assets so transferred to the corporation include, pursuant to section 113 (a) (8), Internal Revenue Code of 1939,[10] the amount of gain thus recognized. Such conclusion is a *non sequitur*, with which we disagree.

As a condition precedent to the application of section 113 (a) (8), *supra*, it is first necessary that compliance be had with the section 112 (b) (5) requirement. That is to say, the property involved must have been acquired by the corporation by issuance of stock "in connection with a transaction described in section 112 (b) (5)." Since we have found hereinabove that the notes which were received by petitioners and which by them are claimed to represent "other property" under section 112 (c) (1), were in fact representative of risk capital invested in the nature of stock, the "solely in exchange for stocks or securities" requirement of section 112 (b) (5) was, in our considered judgment, satisfied. Furthermore, immediately after the exchange the transferors were in control of the transferee corporation, and the stock which they received was in proportion to their interests in the property prior to the exchange. Thus, in our opinion, the exchange involved was a so-called section 112 (b) (5) transaction, as a result of which no gain or loss should have been recognized. The fact that gain was erroneously recognized to the extent that the

[9] SEC. 112. RECOGNITION OF GAIN OR LOSS.
(c) GAIN FROM EXCHANGES NOT SOLELY IN KIND.—
(1) If an exchange would be within the provisions of subsection (b) (1), (2), (3), or (5), or within the provisions of subsection (1), of this section if it were not for the fact that the property received in exchange consists not only of property permitted by such paragraph or by subsection (1) to be received without the recognition of gain, but also of other property or money, then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property.

[10] SEC. 113. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS.
(a) BASIS (UNADJUSTED) OF PROPERTY.—The basis of property shall be the cost of such property; except that—
* * * * * * *
(8) PROPERTY ACQUIRED BY ISSUANCE OF STOCK OR AS PAID-IN SURPLUS.—If the property was acquired after December 31, 1920, by a corporation—
(A) by the issuance of its stock or securities in connection with a transaction described in section 112 (b) (5) (including, also, cases where part of the consideration for the transfer of such property to the corporation was property or money, in addition to such stock or securities), or
(B) as paid-in surplus or as a contribution to capital, then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer under the law applicable to the year in which the transfer was made.

fair market value [11] of the assets exceeded their depreciated cost and a capital gains tax paid thereon by petitioners and their daughter, and the consideration of petitioners' redress in the premises are matters beyond the scope of this opinion.

The corporation having received the property in question in a transaction described in section 112 (b) (5) wherein no gain or loss is recognized "under the law applicable to the year [1946] in which the transfer was made," see section 113 (a) (8), we have no alternative to denying petitioner corporation the stepped-up bases which it seeks. Consequently, respondent is sustained as to this issue.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*

WITHEY, *J.*, concurs in the result.

---

[11] We think petitioner's valuation of the depreciable assets involved was substantially correct.   Any overvalution of the trucking equipment was more than offset by what appears to have been an undervaluation of the mechanical rides.