Ben P. Gale and Mary B. Gale v. Commissioner.
Gale v. Commissioner
Docket No. 50969.
United States Tax Court
T.C. Memo 1956-103; 1956 Tax Ct. Memo LEXIS 193; 15 T.C.M. (CCH) 518; T.C.M. (RIA) 56103; April 30, 1956
*193 Held: The advances by Ben P. Gale during the year 1946 to the Universal Plating Company as evidenced by three promissory notes of that company were contributions to capital rather than bona fide loans. Warren E. Hacker, Esq., Union Commerce Building, Cleveland, Ohio, for the petitioners. Donald G. Corley, Esq., for the respondent. BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: This proceeding involves deficiencies in income tax determined by respondent for the years 1948, 1949, and 1950 based upon certain transactions occurring in 1946 with respect to the interest of Ben P. Gale in the Universal Plating Company. The deficiencies determined are as follows: 1948
$ 753.76
1949
2,696.54
1950
2,667.74
Petitioners contend that *194 the losses on certain advances made to the Universal Plating Company by Ben P. Gale are deductible in 1946 as nonbusiness bad debts and hence as short-term capital losses under section 23(k)(4), Internal Revenue Code of 1939. Respondent claims that the deduction for those losses is allowable as a long-term capital loss, only 50 per cent of which is to be taken into account under section 117(b), Internal Revenue Code of 1939. [1] This difference in view is reflected in the amount of net capital loss carry-over to the years in question allowed by section 117(e), Internal Revenue Code of 1939. The reduction in net capital loss carryover as determined by respondent increases the *195 adjusted gross income under section 22(n) and consequently reduces the amount of medical expense allowable as a deduction in each of the years 1948, 1949, and 1950 under section 23(x). The amounts paid for medical expense are agreed upon. Accordingly disposition of this issue will follow from determination of the principal issue. The principal issue is whether the sums advanced by Ben P. Gale during the year 1946 to the Universal Plating Company and evidenced by three promissory notes of that Company were in fact capital contributions rather than bona fide loans. If we find the advances were bona fide loans we must determine also whether the notes dated January 5, 1946 and May 1, 1946 evidencing part of the amounts advanced were totally worthless as of December 31, 1946. All other adjustments by respondent were either conceded or the objections thereto abandoned. Findings of Fact Some of the facts were stipulated and are incorporated herein by this reference. Ben P. Gale and Mary B. Gale are husband and wife having their address at 1280 Union Commerce Building, Cleveland 14, Ohio. They filed joint Federal income tax returns for the years involved with the collector of internal *196 revenue for the 18th district of Ohio. During 1945 and 1946 Ben P. Gale (hereinafter sometimes referred to as petitioner) was engaged in the insurance business in Cleveland, Ohio. He was not engaged in the trade or business of lending money. In December 1945 petitioner met Frank J. Crowley, a chemical engineer and sales manager of a Cleveland chemical concern. Crowley had obtained on November 23, 1945 at a cost of $500 an option from the Universal Plating Corporation to purchase the business and assets of that corporation. Having insufficient funds to effect the purchase alone, Crowley sought aid in its financing and it was for this reason that he contacted, among others, the petitioner. Prior to December 21, 1945 petitioner, Crowley, and other interested parties, namely, John Tyner, Guthrie Bicknell, Charles F. Kling, and Mark A. Loofbourrow, devised a plan to effect the purchase. It was agreed that a new corporation would be formed with a capital of $500 represented by 1,000 shares of stock; that the stock would be issued 314 shares each to petitioner and Bicknell, 40 shares to Kling, 38 shares to Tyner, 44 shares to Loofbourrow, and 250 shares to Crowley; that Crowley would *197 assign the option to the new corporation for $500; and that petitioner, Bicknell, Tyner, and Kling would advance a total of $89,500 to the new corporation, these advances to be evidenced by a promissory note of the new corporation and secured by a chattel mortgage on its chattel property. It was further agreed that Crowley would be in active charge of the new corporation as he had the "know-how" and was supposed to be able to bring in a great deal of business because of his contacts through his chemical company. Petitioner, Bicknell, Kling, Tyner, and Loofbourrow were not familiar with the plating business. All of these individuals save Crowley and Tyner, who were cousins, were unrelated. Loofbourrow, petitioner's attorney, brought this transaction to the attention of petitioner and assisted Crowley in selling petitioner on it. On December 21, 1945 the petitioner and his associates caused the formation of the Industrial Plating Company (hereinafter referred to as the Company) under the laws of Ohio with an authorized capital of $500 represented by 1,000 shares of no par stock. On January 4, 1946 the Company's stock was subscribed and paid for in cash pursuant to the plan for purchase, *198 as follows: No. of
Amount
Purchaser
Shares
Paid
Ben P. Gale
314 $157
Guthrie Bicknell
314
157
Charles F. Kling
40
20
John Tyner
38
19
Mark A. Loofbourrow
44
22
Frank J. Crowley
250
125
Total
1,000 $500 This stock was owned as set out above at all times here pertinent except as hereinafter stated. The Company's Articles of Incorporation were amended by vote of the stockholders on January 4, 1946 to change the Company's name to Universal Plating Company and on January 17, 1946 a certificate of such amendment was filed with the Secretary of State for Ohio. At a meeting of the Company's board of directors on January 4, 1946 the following resolution was adopted: "RESOLVED, that the officers of the Company be, and they hereby are, authorized to borrow the sum of $90,000.00 with interest at eight per cent (8%) per annum, repayable at the rate of one-sixth every six months and secured by a chattel mortgage on all of the assets of the Company, the other terms and conditions of such loan to be agreed upon between the officers of the Company and the lender. "RESOLVED FURTHER, that the officers be, and they hereby are authorized to execute *199 such promissory note or notes, chattel mortgage or mortgages, and other documents and agreements as may be required in order to make the foregoing resolution effective." Also on January 4, 1946 petitioner, Bicknell, Tyner, Kling, and Crowley entered into an agreement under which petitioner was designated trustee to collect the amounts due to them (totalling $90,000) as a result of the advances (totalling $89,500) and for the assignment of the option ( $500) which were to be made to the Company on January 5, 1946. It was further agreed that the note, the chattel mortgage, and all other security thereunder should run in favor of the petitioner. Petitioner agreed to distribute all principal, interest, or other proceeds or income paid on said note or received for security thereunder in the following proportions: Percentage
Ben P. Gale
44.1675
Guthrie Bicknell
44.1675
Charles F. Kling
5.5550
John Tyner
5.5550
Frank J. Crowley
.5550 Under this agreement petitioner had the full right of action in the event of the Company's default on its promissory note. Pursuant to the plan for purchase and the above resolution the Company received on January 5, 1946 a total *200 of $89,500, as follows: Ben P. Gale
$39,750
Guthrie Bicknell
39,750
Charles F. Kling
5,000
John Tyner
5,000 On the same day the Company executed and delivered to petitioner its promissory note in the principal amount of $90,000 payable in five equal semi-annual installments of $18,000 each with interest at the rate of eight per cent per annum and as collateral therefor a chattel mortgage on its 1934 Chevrolet truck which was recorded on January 11, 1946 on Motor Vehicle Title No. 181775727, and a chattel mortgage on all of its other chattel property which was filed with the Recorder of Cuyahoga County, Ohio on January 5, 1946 and recorded as Instrument No. 1298234 of the records of that county. On January 5, 1946 Crowley assigned the option to the Company upon the Company's agreement to pay him $500, for which amount Crowley agreed to take the Company's promissory note. This amount was included in the $90,000 note mentioned above. The Company exercised the option on the same date and thereafter at all times pertinent was engaged in the chrome and nickel-plating business. It operated in leased quarters and at no time during 1946 did it own any real estate. *201 From January 4, 1946 until April 30, 1946 the Company's officers were as follows: Frank J. Crowley
President
Chris Vargo
Vice President
Mark Loofbourrow
Secretary
Ben P. Gale
Assistant Secretary
William G. Macomber
Treasurer
Guthrie Bicknell
Assistant Treasurer Crowley, Loofbourrow, Bicknell, Kling, and petitioner were directors of the Company. At various times during 1946 Tyner was an employee of the Company. By April 30, 1946 petitioner and the others had become dissatisfied with Crowley's management of the Company because they felt that he had not applied himself to the Company's business and because his contacts had not developed the business which had been expected. Accordingly, on April 30, 1946 Crowley resigned as president and Macomber was elected president and a director. Vargo was put in charge of operations and was elected a director. On or about April 30, 1946 Crowley sold 15 of his shares in the Company to Vargo and 85 of his shares to the Company for 50 cents per share. These 85 shares were held in the Company's treasury at all pertinent times thereafter and except as stated below the said 15 shares were held by Vargo until December 31, 1946. *202 At a meeting held April 30, 1946 the Company's board of directors adopted the following resolution: "RESOLVED, that the Company borrow the sum of Thirty-One Thousand Dollars ($31,000.00), payable on demand, with interest at eight percent (8%) per annum, the terms, conditions, and collateral to such loan to be fixed by the officers of the Company. "RESOLVED FURTHER, that the officers of the Company be and they hereby are authorized to execute such promissory notes, chattel mortgages, or other documents as may be required to enable the Company to carry into effect the foregoing resolution." On or before May 1, 1946 the Company received an additional $31,000 from the persons and in the amounts, as follows: Ben P. Gale
$13,000
Guthrie Bicknell
13,000
Charles F. Kling
1,500
Chris Vargo
1,500
William G. Macomber
2,000
On May 1, 1946 petitioner, Bicknell, Kling, Vargo, and Macomber entered into an agreement under which they agreed that petitioner should act as trustee for them to collect the amounts due to them upon a promissory note of the Company dated May 1, 1946 in the amount of $31,000; that the note, together with any and all collateral given to secure *203 it, should run in favor of petitioner; and petitioner agreed to distribute all principal, interest, or other proceeds or income paid on said note or received from the security thereunder in the following proportions: Percentage
Ben P. Gale
41.9355
Guthrie Bicknell
41.9355
Charles F. Kling
4.8387
Chris Vargo
4.8387
William G. Macomber
6.4516
Pursuant to the resolution of April 30, 1946 the Company, on May 1, 1946, executed and delivered to petitioner its promissory note in the principal amount of $31,000 payable on demand, together with interest at eight per cent per annum. No collateral was given to secure this note. At the time of Crowley's resignation Chris Vargo felt that he should become president and offered to put money into the Company to have "a stake in the gain." Petitioner and the other interested parties thought Vargo's offer desirable but that Macomber should replace Crowley as president. Petitioner and his associates deemed it advisable that Macomber also have "a stake in the game" to make his becoming president more palatable to Vargo. Therefore petitioner and Bicknell each loaned Macomber $1,000 which he advanced to the Company on May 1, 1946. At *204 the time of his loan to Macomber petitioner expected to be repaid by him. At a meeting held July 15, 1946 the Company's board of directors adopted the following resolution: "RESOLVED, that the Company borrow the sum of not to exceed $25,000.00, payable on demand, with interest at 8% per annum, the terms, conditions, and collateral to such loan to be fixed by any proper officer of the Company. "RESOLVED FURTHER, that the officers of the Company and each of them be and they hereby are authorized to execute such promissory notes, chattel mortgages, or other documents as may be required to enable the Company to carry into effect the foregoing resolution." During July or the early part of August 1946 the Company's plant burned, causing a stoppage of production for about six or seven weeks. At or about the same time it was discovered that the work done by the Company on substantial orders for its two principal customers was defective, with the result that the Company received full payment for approximately 25 per cent of the orders and only ten cents on the dollar for the balance. In September 1946 petitioner and his associates decided that Vargo's employment by the Company should *205 be terminated. Vargo insisted as a condition of his agreeing to the termination of his employment contract that the $1,500 advanced by him to the Company on May 1, 1946 be repaid to him and that petitioner, as record holder of the chattel mortgages on the Company's property, agree to subordinate the lien of those mortgages to such payment. On September 28, 1946 Vargo resigned as vice president and director of the Company and on or about that date Tyner was elected director. Also on that date Vargo, the Company, and the petitioner entered into an agreement under which the Company agreed to repay Vargo his advance of $1,500 in installments of $500 each on November 15, 1946, December 15, 1946, and January 15, 1947; petitioner, with the consent of the other parties interested in the chattel mortgages, subordinated the liens of those mortgages to these payments, and Vargo deposited with Loofbourrow his 15 shares of the Company endorsed in blank to be held in escrow pending performance by the Company. Thereafter and prior to January 4, 1947 the Company repaid the $1,500 advanced by Vargo. Beginning about the time of the fire petitioner gave serious consideration to selling his interest *206 in the Company. He, as well as the other interested parties, tried to find a buyer for the Company beginning in late September, about the time Vargo's employment was terminated. Crowley, Bicknell, Kling, Tyner, and Loofbourrow endorsed in blank their certificates of stock in the Company and transferred them to petitioner so that they could be delivered as part of any sale. A verbal offer, which was thought to be firm, was received in early December 1946; but the prospective purchaser withdrew the offer when efforts were made to formalize it by contract. There were no negotiations, however, with Macomber for his purchase of the Company prior to December 1946. Petitioner and Bicknell believed that it was necessary to keep the Company going to protect their investments until they could dispose of it. However, during September and October 1946 they found that those who had advanced sums to the Company were no longer willing to make further advances. Petitioner and Bicknell were unwilling to advance additional funds and let the others participate in anything that could be salvaged from the Company. Therefore it was agreed by all of the interested parties that any additional amounts supplied *207 by Bicknell and petitioner to the Company would have priority over the notes of the Company dated January 5, 1946 and May 1, 1946, as well as the benefit of the chattel mortgages securing the January note. Thereafter, on or about October 4, 1946, October 18, 1946, and November 14, 1946, respectively, Bicknell and petitioner each advanced to the Company $1,250, $3,000, and $4,000, and pursuant to the directors' resolution of July 15, 1946 the Company on November 14, 1946 executed and delivered to petitioner its promissory note in the principal amount of $16,500 payable on demand with interest at the rate of eight per cent. On or about November 14, 1946 Macomber assigned and transferred to the petitioner and Bicknell in equal shares all his right, title and interest in the note of the Company dated May 1, 1946, and Vargo agreed that upon repayment of the $1,500 by the Company under the agreement dated September 28, 1946 he would release petitioner from all responsibility under the agreement dated May 1, 1946. On December 11, 1946 Tyner, Kling, and Crowley entered into a written agreement whereby they confirmed that the additional advances to the Company by Bicknell and petitioner, *208 evidenced by the November note, should have priority on any liquidation of the Company and should have the full benefit of all collateral securing the notes of the Company dated January 5, 1946 and May 1, 1946. On December 31, 1946 Bicknell assigned to petitioner for $5,000 all his right, title and interest in the promissory notes of the Company dated January 5, 1946, May 1, 1946, and November 14, 1946, as well as his 314 shares of common stock in the Company, and released petitioner as trustee of the said notes. On the same day petitioner assigned and delivered to Macomber for a consideration of $10,000 the promissory notes of the Company dated January 5, 1946, May 1, 1946, and November 14, 1946, together with the chattel mortgages and the certificates for all of the shares of stock in the Company. The shares of the stock in the Company had no value as of that date. No person other than petitioner or Bicknell in any way participated in the $10,000 proceeds from the transaction with Macomber. Petitioner, Bicknell, Tyner, Kling, and Crowley resigned as officers and directors of the Company on December 31, 1946. Macomber continued the Company's operation until March 27, 1947 when *209 he sold the three notes, the chattel mortgages, and the stock of the Company to The Bellows Company, an Ohio corporation, for a price of $11,500. At no time prior to December 31, 1946 did the Company make any payments on the promissory notes dated January 5, 1946, May 1, 1946, and November 14, 1946, except the aforementioned payments to Vargo. The note dated January 5, 1946 provided that if principal or interest was not paid within three days after failling due then the entire balance at once became due and payable at the election of the holder. No demand was ever made for payment of this note. Similarly, no demand was ever made for payment of the demand notes dated May 1, 1946 and November 14, 1946. The monthly balance sheet dated January 31, 1946 [2] furnished petitioner by the Company listed the equipment and machinery acquired from the Universal Plating Company at a value of $65,287, with a depreciation reserve of $630.53. Good will was listed at $500. The Company suffered a net operating loss of $65,556.38 for the period January 4 through December 31, 1946, as follows: Period
Amount of Loss
January
$ 3,319.08
February
2,697.90
March
4,079.01
April
4,532.62
May
3,380.78
June
2,801.93
July
4,975.62
August
11,042.09
September
8,467.10
October
9,640.50
November
4,292.09
December
6,327.66
Total
$65,556.38
*210 At the time of his advance to the Company in May 1946 petitioner was not very sure of complete recovery of the sums advanced. He was even more doubtful of full recovery of the amounts advanced in October and November 1946. The advances by petitioner to the Universal Plating Company in 1946 constituted contributions to capital. Before giving effect to the losses realized by petitioner in 1946 with respect to the sums contributed to the Company and before giving effect to any carry-over of net capital loss petitioner realized long-term capital gains and short-term capital gains and losses for the calendar years 1946 through 1950 as follows Short-term
Short-term
Long-term Capital Gain
Capital Loss
Capital Gain
1946
$45,702.56 at 50%
$22,851.28
$470.18
0
1947
33,870.76 at 50%
16,935.38
0
0
1948
4,165.80 at 50%
2,082.90
0
$159.73
1949
15,000.00 at 50%
7,500.00
0
0
1950
34,872.20 at 50%
17,436.10
0
0 Petitioner did not realize any long-term capital losses in the years 1946 through *211 1950. Petitioners paid $890.08, $1,597.37, and $2,400.70 during the years 1948, 1949, and 1950, respectively, for medical care of themselves and dependents. Opinion The principal issue is whether the sums advanced by petitioner to the Universal Plating Company in the year 1946 and evidenced by three promissory notes of that Company were capital contributions rather than bona fide loans. Unlike many of the decided cases, we do not have before us a case which involves "hybrid securities," instruments which have some of the characteristics of both debentures and stock certificates and the problem has been to determine which they were. Cf. John Kelley Co., 1 T.C. 457, affd. 326 U.S. 521; Talbot Mills, 3 T.C. 95, affd. 326 U.S. 521; New England Lime Co., 13 T.C. 799; Sabine Royalty Corporation, 17 T.C. 1071. In the instant case all of the requirements of form necessary to make petitioner's advances an indebtedness are present. Such indicia are of some evidentiary value, but are not conclusive. Gregory v. Helvering, 293 U.S. 465. The basic question is the relationship in fact created *212 thereby. Estate of Herbert B. Miller, 24 T.C. 923 (on appeal C.A. 9); Gooding Amusement Co., 23 T.C. 408 (on appeal C.A. 6); Kraft Foods Co., 21 T.C. 513 reversed on other grounds (C.A. 2) April 2, 1956, 232 Fed. (2d) 118. The intention of the parties is determinative and is to be gleaned from all the pertinent factors in the case. The Colony, Inc., 26 T.C. - (April 9, 1956); Isidor Dobkin, 15 T.C. 31, affd. 192 Fed. (2d) 392. [3] We have found that the real intent of the parties was not consistent with the ritual and that all of the sums advanced by the petitioner to the company were contributions to capital.
The Universal Plating Company was organized with a small amount of capital, which was grossly inadequate for carrying out the purchase of the business and assets of the *213 Universal Plating Corporation and for its operation. Petitioner does not dispute the obvious inadequacy of the Company's capital. He argues, however, that other factors collectively outweigh the inference to be drawn from a ratio of formdebt ($90,000) to form-capital ( $500) of 180 to 1. Cf. Edward G. Janeway, 2 T.C. 197, affd. per curiam 147 Fed. (2d) 602. Petitioner argues that the intention of the parties to create a debtor-creditor relationship is clearly indicated from the fact that the advances of January 5 and May 1 [4] were made pursuant to apporpriate corporate authorization, and were evidenced by interest-bearing notes having fixed maturity dates and not subordinated to other creditors when issued, citing Wilshire & Western Sandwiches, Inc. v. Commissioner, 175 Fed. (2d) 718. Even more significant, petitioner suggests, are the facts that the advances made in January were pursuant to an agreement among unrelated parties antedating the formation of the Company, were in amounts disproportionate to stockholdings; and were secured by chattel mortgages upon all of the tangible assets of the Company, which contained provisions for foreclosure *214 upon default of principal or interest. We stated our position with respect to the intent described in Wilshire & Western Sandwiches, Inc., supra, in footnote 1 to our opinion in Isidor Dobkin, 15 T.C. 31, affd. 192 Fed. (2d) 392 as follows: "The determinative intent described in Wilshire & Western Sandwiches, Inc., 175 Fed. (2d) 718, must necessarily be the objective intent disclosed by all the pertinent factors in the case and not the formal manifestation of intent declared by the taxpayer. Cf. O'Neill v. Commissioner, 170 Fed. (2d) 596, certiorari denied 336 U.S. 937." We further observed in the Dobkin case that: "When the organizers of a new enterprise arbitrarily designate as loans the major portion of the funds they lay out in order to get the business established and under *215 way, a strong inference arises that the entire amount paid in is a contribution to the corporation's capital and is placed at risk in the business. Cohen v. Commissioner, 148 Fed. (2d) 336; Joseph B. Thomas, 2 T.C. 193. The formal characterization as loans on the part of the controlling stockholders may be a relevant factor but it should not be permitted to obscure the true substance of the transaction. Sam Schnitzer, 13 T.C. 43, 60." Herein the initial advances totalling $90,000 were immediately placed at the risk of the business in the same manner as the capital of a normal corporation. See Hilbert L. Bair, 16 T.C. 90, affd. 199 Fed. (2d) 589. These contributions constituted substantially everything the Company possessed and which it required to commence its operation and to remain in business. Cf. Estate of Herbert B. Miller, supra; R. E. Nelson, 19 T.C. 575. It is apparent therefore that these advances were at all times intended to be placed at the risk of the business as capital. Cf. Erard A. Matthiessen, 16 T.C. 781, affd. 194 Fed. (2d) 659. The status *216 created by these advances more nearly approximates that of preferred shareholders than of bona fide creditors despite the form adopted. Those factors upon which the petitioner relies except for form are not inconsistent with a preferred proprietary interest. The disproportion between the advances and stockholdings is not incompatible with common and preferred stock interests. The Colony, Inc., supra. Nor is such disproportion believed to be of such major importance where, as here, the two * stockholders, petitioner and Bicknell, who advanced the greater part of the funds (88%) did so in equal proportions to one another and they were the controlling stockholders, owning 62% of the stock likewise in equal proportions to one another. The reason for the small advance by Crowley, the third major stockholder, appears to lie in the fact that he owned the option and was thought to have the "know-how" and the business contacts. Loofbourrow, who made no cash contribution, was the attorney handling the legal work and the contributions of Kling and Tyner, the smallest stockholders, were substantially, though not exactly, in proportion to their stockholdings. *217 The fact that the initial advances amounting to $90,000 were secured by chattel mortgages on the tangible property (which they were used to acquire), while invoking serious consideration, is likewise not sufficient, under the circumstances here present, to require a determination that such advances constituted indebtedness rather than capital contributions. For tax purposes the execution of such chattel mortgages under the circumstances here was but another instance of obeisance to form rather than substance. The security afforded by the chattel mortgages was grossly inadequate to support a bona fide loan in the amount of $90,000. The machinery and equipment upon which these liens were given was carried on the company's balance sheet of January 31, 1946 at approximately $66,000 and there is no evidence that their fair market value as of January 5, 1946 exceeded that amount. In fact it is doubtful that an outsider, dealing at arm's length, would have considered such assets sufficient to secure a loan in the latter amount. The whole business was sold one year later to one of the Company's officers for $10,000 and he sold it three months later for $11,500. Furthermore, the evidence *218 does not establish any real belief on the part of the petitioner that the property given as security was worth the $90,000 advanced. His testimony indicates he was considering the value of such assets on the basis of their worth to a going concern rather than the amount that could be realized upon resale. True, petitioner expected to be repaid the sums initially advanced by him, but this expectation arose out of his faith in the future success of the Company and not out of any belief that the assets on which the chattel mortgages were given were sufficient to assure him repayment. It is also questionable to what extent, if any, these chattel mortgages would have been upheld against the claims of general creditors if the question had arisen, as in bankruptcy. See Estate of Herbert B. Miller, supra; Arnold v. Phillips, 117 Fed. (2d) 497, certiorari denied 313 U.S. 583. See also Pepper v. Litton, 308 U.S. 295; Taylor v. Standard Gas & Electric Co., 306 U.S. 307. Petitioner's right to interest did not place him in any substantially better position than he would have been had he had the right to dividends on cumulative *219 preferred stock. Indeed we are unable to find any purpose other than tax benefit, in the reason offered by petitioner for this absurdly low capitalization which could not have been accomplished by a preferred stock issue. Petitioner testified that this dominant debt structure was employed to satisfy the insistence of Frank Crowley that he have "a 25 per cent interest in the Company." No further evidence was offered with respect to its raison d'etre. Cf. Estate of Herbert B. Miller, supra; Swoby Corporation, 9 T.C. 887. We do not, of course, suggest that petitioner and his co-stockholders were required to issue preferred stock or to otherwise conduct their affairs so as to pay the most tax. We merely point out that the factors upon which petitioner relies are not inconsistent with a proprietary interest, and therefore, they do not prove that in reality a debtor-creditor relationship was established. Similarly, the advances made in May, October, and November evidenced by notes dated May 1, 1946 and November 14, 1946 were capital contributions rather than bona fide loans. The motivation for these advances closely approximates the typical case of an owner *220 of stock attempting to salvage a part of his investment by additional contributions to capital rather than true loans. Cf. Erard A. Matthiessen, supra.If these advances by petitioner and Bicknell were disproportionately large it was because their previous advances had been greater and they had more to lose. The advances by Macomber and Vargo were made to give the newly elected president and vice president in charge of operations, respectively, "a stake in the game." Just how a loan by Macomber, a non-stockholder, could give him "a stake in the game" is not clear. Though perhaps but a "straw in the wind," this is indicative of a belief on the part of both petitioner and Bicknell that all the advances were in fact capital investments. Respondent has argued that if the advances by petitioner were found to be capital contributions then the loss resulting from the sale of each of the three notes was a long-term capital loss. While sustaining respondent's contention with respect to the notes dated January 5, 1946 and May 1, 1946, we find that the loss resulting from the sale of the note dated November 14, 1946 was a short-term capital loss, such note having been held for *221 less than six months. Since we have concluded that the sums advanced by petitioner to the Company did not constitute loans but rather capital contributions, it is unnecessary to consider the second issue. Decision will be entered under Rule 50. Footnotes
1. SEC. 117. CAPITAL GAINS AND LOSSES. * * *
(b) Percentage Taken Into Account. - In the case of a taxpayer, other than a corporation, only the following percentages of the gain or loss recognized upon the sale or exchange of a capital asset shall be taken into account in computing net capital gain, net capital loss, and net income: 100 per centum if the capital asset has been held for not more than 6 months; 50 per centum if the capital asset has been held for more than 6 months. * * *↩
2. Respondent's objection to the admissibility of petitioner's Exhibit 26, on which ruling was reserved at the hearing, is hereby overruled.↩
3. For an extensive discussion of the several criteria to be considered in determining whether a particular transaction created a debtor-creditor or a stockholder relationship see note on "Thin Capitalization and Tax Avoidance," 55 Columbia Law Review 1054 (1955)↩, and the numerous authorities referred to therein.
4. Petitioner made no argument with respect to the advances made in October and November 1946 and evidenced by the Company's note dated November 14, 1946, stating that the loss resulting from the sale of that note was a short-term capital loss whether it be regarded as an indebtedness or a contribution to capital.↩
*. This word replaced the word "true." Official correction was made by an Order of the Tax Court, dated May 14, 1956, and signed by Judge Bruce.↩