John Fox and Olga P. Fox v. Commissioner.
Fox v. Commissioner
Docket No. 64833.
United States Tax Court
T.C. Memo 1958-205; 1958 Tax Ct. Memo LEXIS 18; 17 T.C.M. (CCH) 1006; T.C.M. (RIA) 58205; December 9, 1958
Burton L. Williams, Esq., for the petitioners. J. Frost Walker, Jr., Esq., and Raymond T. Mahon, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The respondent determined the following deficiencies for the years 1949 to 1953: Additions to Tax, I.R.C. of 1939
Income
Sec. 294
Sec. 294
Year
Tax
Sec. 291(a)
Sec. 293(a)
(d)(1)(A)
(d)(2)
1949
$ 18,663.90
$4,665.97
$ 933.20
$1,741.92
$ 1,045.15
1950
52,207.43
2,548.14
2,297.37
1951
351,852.06
17,592.60
25,802.34
1952
352,583.94
17,629.20
21,035.62
1953
167,479.74
8,373.99
29,256.00
The issues remaining for decision are (1) are the petitioners entitled to deductions in 1951 and 1952 for amortization and interest resulting from *19 dealings in Appalachian Electric Power Company bonds, (2) are deductions allowable in 1952 and 1953 for interest paid in connection with a transaction in Treasury notes, (3) are dividends in 1953 from stock of North Penn Gas Company and income from certain gas leases in 1953 taxable to the petitioners or to Post Publishing Company, and (4) are the petitioners liable for the addition to tax for negligence under section 293(a) of the Internal Revenue Code of 1939 for 1950 or 1952? The taxpayers' returns were filed with the collector or the director of internal revenue at Boston, Massachusetts. Findings of Fact The stipulated facts and exhibits thereto are incorporated. The petitioners, husband and wife, reside at Newton Centre, Massachusetts. Their accounts and records were maintained and their joint income tax returns were prepared on a cash basis and for calendar years. John Fox is an attorney, admitted to practice. For a number of years he was in the brokerage business but gave that up after 1948. While in that business he bought and sold securities for customers and also on his own account. During the years 1951 to 1954 Fox had substantial investments in stocks and bonds *20 and in oil or gas leases. He owned the controlling stock of certain corporations and had substantial interests in others. On occasion he borrowed large sums on loans secured by collateral. Some of his financial dealings were with or through the agency of Standish T. Bourne, a partner in the firm of Simmons, Bourne & Co., a note brokerage firm of Boston. Standish Bourne was also one of the trustees of Dartmouth Associates Trust, an investment trust, herein sometimes referred to as Dartmouth. On September 13, 1951, Fox purchased through Dartmouth $1,500,000 of Appalachian Electric Power 3 3/4 per cent bonds at 107 3/4, which bonds had a maturity date in 1981. These bonds were callable in whole or in part on 30 days notice at any time at a general call price of 105 3/4. They were also callable on like notice for maintenance and improvement funds, or with proceeds of released property or insurance at a special call price of 102 3/8. The total purchase price for these bonds was $1,616,250 plus $16,717.50 accrued interest, making a total of $1,632,967.50. On September 18, 1951, Fox obtained a loan from Dartmouth of $1,632,967.50 to pay for the bonds. This loan bore interest at 5 *21 1/2 per cent. Fox gave Dartmouth a non-recourse note representing this liability, which note was due and payable on March 20, 1952 and was secured by a pledge of the $1,500,000 Appalachian Electric Power Company bonds. This note contained the following stipulations: "The undersigned hereby gives to the Trust a lien against the securities pledged, and the Trust shall have the right to rehypothecate or to use the said securities for any different purposes while they are pledged to it. "The undersigned shall have the right to order the liquidation of the securities pledged at which time interest on this note shall cease. "The undersigned shall not be called upon to furnish additional collateral at any time before the maturity of this note. "At the maturity of this note, the undersigned shall have the right to order the sale or liquidation of the securities held in pledge; the proceeds realized from this sale or liquidation, shall be applied to discharge the entire indebtedness of the undersigned. "The undersigned shall not be held liable for any deficiencies arising at the time of the sale or liquidation of the securities so held, and the Trust shall only took to the proceeds *22 from such sale or liquidation for the satisfaction of the obligation under this instrument. "On each interest date, the Trust shall credit the undersigned with interest from the coupons accruing to him on the bonds pledged as collateral, and the undersigned shall pay the interest accruing to such interest date." On December 3, 1951, Fox was obligated to pay interest of $45,904.52 to Dartmouth on his note of September 18, 1951. The Appalachian bonds paid interest of $28,125 on December 1, 1951, which was paid to Dartmouth. In addition, on December 18, 1951, Fox transferred to Dartmouth 375 shares of Western Union Class A stock which Dartmouth valued on its books at $17,779.52. On December 19, 1951, Western Union stock sold at 40 5/8 per share. On March 20, 1952, Fox renewed the note for another on the same terms payable September 21, 1952. On March 31, 1952, Fox purchased $750,000 additional of the same issue of Appalachian bonds. The total purchase price for these bonds was $810,000 plus accrued interest of $9,375 with minor adjustments for commission and taxes, which made the total purchase price $818,062.50. To finance this purchase, Fox borrowed from Dartmouth $818,062.52. *23 This loan was secured by a non-recourse dated March 31, 1952, bearing 5 1/2 per cent interest and was secured by a pledge of the $750,000 Appalachian Electric Power Company bonds. The principal of the note was payable on October 6, 1952, and the interest was payable on June 1, 1952. As of June 2, 1952, Fox owed $18,461.65 as interest on the note which he gave to Dartmouth on September 19, 1951 in the face amount of $1,632,967.50, and on June 2, 1952, interest payable to Fox had accrued on the $1,500,000 Appalachian bonds in the amount of $29,688. On June 2, 1952, Fox sold $1,500,000 Appalachian Electric Power 3 3/4 bonds maturing in 1981 to Dartmouth at a price of 107 3/4. The total sales price was $1,616,250 plus $1,563 accrued interest, which was $15,154.50 less than the total purchase price plus interest which Fox had paid for the bonds. On that date Fox's first note, now due on September 21, 1952, was canceled. On June 1, 1952, there was $23,621.37 interest due on Fox's note dated March 31, 1952, and on June 1, 1952, interest payable to Fox had accrued on the $750,000 Appalachian bonds in the amount of $14,062.50. On July 24, 1952, Fox borrowed $63,000 from Standish T. *24 Bourne individually. From the proceeds of this $63,000 loan, Fox paid to Standish T. Bourne individually $15,000 which, together with the interest income on the Appalachian bonds, was used to pay the interest accrued on Fox's two notes then outstanding to Dartmouth and the remaining unpaid principal amount of his note dated September 18, 1951. On October 6, 1952, Fox sold $750,000 Appalachian Electric Power 3 3/4 bonds maturing in 1981 to Dartmouth at a price of 108. The total sales price was $810,000 plus $9,765.60 accrued interest, which was $1,703.10 more than the total purchase price which Fox had paid for the bonds. Appalachian Electric Power Company bonds were trade over the counter. The bid and asked prices and the mean of such prices on the following dates were: Date
Bid
Asked
Mean
Sept. 7, 1951
107 3/8
107 3/4
107 9/16
March 14, 1952
108
108 1/2
108 1/4
End of May 1952
107 1/2
108 1/2
108
End of June 1952
107 1/2
108 1/4
107 7/8
End of October 1952
109
110
109 1/2
End of January 1953
110 1/2
110 1/2
End of January 1954
120 1/2
121 1/2
121
In 1951 and 1952 the petitioners computed the amortizable bond premium on the *25 Appalachian bonds with reference to the special call price of 102 3/8. Fox did not pay any interest on indebtedness to Dartmouth Associates Trust in 1951 or 1952. Fox borrowed $48,000 from Bourne on June 15, 1952. Fox gave a mortgage for $100,000 on some property at Fairfield, Connecticut, as security for this and other advances by Bourne. Fox paid $45,000 on or about that date to Bourne, as agent for M. Eli Livingstone, doing business as Livingstone & Company, of Boston, to cover his down payment on a transaction in United States Treasury notes. Bourne paid $6,500 of this for Livingstone on July 31, 1952 and did not remit the balance until 1957. On or about July 30, 1952, Fox placed an order with Bourne for the purchase of $30,000,000 of United States Treasury 1 3/8 per cent notes due March 15, 1954 at 98-30/32. Bourne "purchased" such notes for the account of Fox through Livingstone & Company from C. J. Devine & Co., of New York, New York for $29,681.250 plus accrued interest of $154,687.50, a total of $29,835,937.50. Devine & Co. confirmed the "sale" to Livingstone & Company which in turn confirmed the purchase to Fox. Fox borrowed the balance of the purchase price, $29,790,937.50 *26 from Seaboard Investment Corporation, a Massachusetts corporation, incorporated in July 1952, and gave his promissory note therefor dated July 31, 1952. This note contained the following conditions: "On June 15, 1953, I promise to pay to Seaboard Investment Corp., the sum of - "TWENTY-NINE MILLION SEVEN HUNDRED NINETY THOUSAND NINE HUNDRED THIRTY-SEVEN AND 50/100 DOLLARS together with interest at the rate of 2 5/8% per annum, subject to the following rights and conditions, having deposited with the said obligee the following securities: "$30,000,000.00 U.S. Treasury 1 3/8% Notes 3/15/54. "On September 15, 1952, the undersigned shall pay to the Seaboard Investment Corp., the sum of $51,562.50, (undersigned shall receive from Seaboard Investment Corp., the full coupon interest maturing September 15, 1952 less accrued interest paid at time of purchase), which shall be applied against the interest owed by the undersigned to the Seaboard Investment Corp. "The undersigned gives to the obligee a lien against the securities pledged for the amount of the obligations set forth herein, and gives to the obligee the right to hypothecate and use the securities pledged for any purpose *27 while so pledged. "The undersigned shall not be called upon nor be liable to furnish additional collateral to the obligee at any time. "In the event of such sale or liquidation prior to the maturity of this note, the Seaboard Investment Corp., shall have the right to add interest from the date of repayment of this loan to the maturity date at the rate of 1% per annum. The addition of such interest to the maturity date shall be subject to the conditions contained in the following paragraph. "The undersigned shall not be liable for any deficiency as to the principal or interest arising at the time of such sale or liquidation from such proceeds; and payment of all obligations of the undersigned under this instrument shall be made from and only from, and be charged against and only against the proceeds of such sale or liquidation and from no other source whatsoever. The required application of such proceeds of such sale or liquidation shall be a full and complete discharge of any and all liability of the undersigned under this instrument. "The terms of this note may be extended to December 15, 1953 in the event that the market price of U.S. Treasury 1 3/8% Notes of 3/15/54 are *28 selling at 99.50 or less." On July 31, 1952, Fox instructed Livingstone & Company to deliver the notes to Seaboard and instructed Seaboard to receive them against payment of the loan. The notes were delivered to Guaranty Trust Company for the account of Livingstone as agent for Fox. Guaranty Trust Company acknowledged to Livingstone & Company receipt of the notes for Livingstone's account, and charged Livingstone & Company and credited Devine & Co. therefor. Fox had pledged the notes with Seaboard as security for his note. Livingstone & Company, as agent for Seaboard, "sold short" the notes on the same date to C. J. Devine & Co. Guaranty Trust redelivered the notes to Devine & Co., charged Devine & Co. and credited Livingstone & Company therefor, and confirmed the transaction to Livingstone. Interest paid on the United States Treasury 1 3/8 per cent notes from March 15, 1952 to September 15, 1952 (the coupon date) totaled $206,250. Of this amount, $154,687.50 represented interest accrued as of the date of the sale. On or about October 13, 1953, Fox notified Seaboard to deliver to Livingstone & Company the collateral for his loan from Seaboard (the notes) so that the collateral *29 could be sold in satisfaction of Fox's debt to Seaboard. Seaboard instructed Livingstone & Company to "buy-in" $30,000,000 of United States Treasury 1 3/8 per cent notes to cover Seaboard's short sale of July 31, 1952. Livingstone & Company purchased $30,000,000 of United States Treasury 1 3/8 per cent notes for the account of Seaboard from C. J. Devine & Co. for the sum of $29,981,250 plus accrued interest of $31,906.07, making a total purchase price of $30,013,156.07. Devine & Co. sent to Livingstone & Company a confirmation of this sale. The notes were delivered to Guaranty Trust Company which charged Livingstone and credited Devine & Co. therefor. On the same date, Livingstone & Company resold the notes to C. J. Devine & Co. on behalf of Fox to enable Fox to satisfy his debt to Seaboard. Livingstone sent Fox a confirmation of the sale. Guaranty Trust Company delivered the notes to Devine & Co. and charged Devine and credited Livingstone therefor. Following are the bid and asked prices of United States Treasury 1 3/8 per cent notes due March 15, 1954, on the dates shown: Date
Bid
Asked
5/29/52
99.7
99.9
6/30/52
99.3
99.6
7/31/52
99.0
99.3
9/30/53
99.28
99.3
10/30/53
100.2
100.4
12/31/53
100.7
100.9
*30 The president of Seaboard was Samuel Livingstone, a brother of M. Eli Livingstone. Seaboard filed corporation income tax returns for the fiscal years ended June 30, 1953, and June 30, 1954. Its principal business activity was described in the returns as "Finance." Its balance sheet showed no assets or liabilities as of July 1, 1952. The balance sheets contained in the returns show assets and liabilities at the close of its fiscal years ended in 1953 and 1954 as follows: ASSETS
June 30, 1953
June 30, 1954
Cash
$ 741.81
$ 342.06
Notes and accounts receivable
$162,688,123.59
Less: Reserve for bad debts
1,579,968.75
161,108,154.84
Other assets
573,672.70
50.00
TOTAL ASSETS
$161,682,569.35
$ 392.06
LIABILITIES
Accounts payable
$ 86,550.30
$119,630.34
Accrued expense
8,126.90
Other liabilities (short sales)
161,780,973.19
Capital Stock: Common stock
700.00
700.00
Earned surplus and undivided profits
(193,781.04)
(119,938.28)
TOTAL LIABILITIES
$161,682,569.35
$ 392.06
In its corporate income tax return for the fiscal year ended June 30, 1953, Seaboard reported total income of $1,401,106.96, consisting *31 entirely of "Gross profit where inventories are not an income-determining factor," total deductions of $1,594,863 (including "Losses" in the amount of $1,579,968.75 and salaries of two officers in the amount of $11,300), resulting in a net operating loss of $193,756.04, and no tax due. In its return for the fiscal year ended June 30, 1954, Seaboard reported total income of $430,581.89, consisting entirely of "Interest on loans, notes, mortgages, bonds, bank deposits, etc." deductions of $356,739.13 (including losses on short sales of $327,218.75), no net income after carryover of net operating loss for 1953, and no tax due. The following journal entries appear on the books of Seaboard Investment Corporation: (a) Under date of July 30, 1952 there is an entry which shows a debit to Notes Receivable - John Fox, and a credit to Accounts Receivable - L. & Co. (Livingstone & Co.) in the amount of $29,790,937.50. (b) Under date of July 30, 1952 there is an entry which shows a debit to Accounts Receivable - L. & Co. (Livingstone & Co.), and a credit to Short Sales, in the amount of $29,793,750. This short sale is also reflected in Seaboard's Sales Journal on July 30, 1952 where it *32 is shown as two short sales to Livingstone & Co. in the amounts of $19,862,500 and $9,931,250 for a total of $29,793,750. (c) Under the date of July 1, 1953 there is an entry which shows a debit to Short Sales and a credit to Notes Receivable - John Fox, in the amount of $154,687.50. The explanatory entry following this entry reads as follows: "To reduce the June 30, 1953 balance for that portion of the coupons received on the subsequent coupon date which represented accrued interest at the time the customer purchased his bonds and similarly reduce the accrued interest received on the short sale of the bonds." (d) Under the date of October 13, 1953 there is an entry which shows a multiple debit to the Short Sales, Loss on Short Sales and Interest Income accounts in the respective amounts of $29,639,062.50, $342,187.50 and $31,906.07, and a credit to Accounts Receivable - L. & Co. (Livingstone & Co.), in the amount of $30,013,156.07. This entry also appears in Seaboard's Purchase Journal on October 13, 1953 as a purchase of U.S. Treasury notes in the amount of $29,981,250. (e) Under the date of October 13, 1953 there is an entry which shows a debit to Accounts Receivable *33 - L. & Co. (Livingstone & Co.) in the amount of $30,013,156.07 and a multiple credit to Notes Receivable - John Fox and to Interest Income in the respective amounts of $29,636,250 and $376,906.07. The explanatory entry following these two General Journal entries of October 13, 1953 reads: "To record delivery of bonds from L. & Co. (Livingstone & Co.) to cover short sale and re-delivery for account of John Fox in cancellation of note and interest due." Fox did not pay any interest on indebtedness to Seaboard Investment Corporation in 1952 or 1953. In June 1952 Fox signed a contract for the purchase of the stock of the Post Publishing Company, which published the Boston Post. In September 1952, he acquired ownership of all the stock of this company. The Post Publishing Company had operated at a loss for some years. After acquiring the stock, Fox became president and treasurer and one of the three directors, and named two of his employes as the other two directors. At the time he acquired the Publishing Company Fox owned a large percentage of the preferred stock of Pennsylvania Gas and Electric Corporation which was in process of reorganization. This stock had been pledged and *34 deposited with various banks as security for loans to Fox. In the reorganization Fox was entitled to receive stock of the North Penn Gas Company, a former subsidiary of Pennsylvania Gas and Electric Corporation. The shares, when issued, were deposited with the banks as collateral. The minutes of the board of directors of the Post Publishing Company concerning meetings on the dates here listed show that all the directors were present and voted, and state in part - "January 5, 1953 "The president presented to the directors a plan whereby Post Publishing Company might possibly acquire that percentage of control of the stock of Mississippi Central Railroad Co. by the expenditure of $500,000 so that the Post and it might be able to report consolidated income tax returns which would result in earnings, which would be exempt from federal income taxes, of $300,000 per year. He suggested, therefore, that the directors authorize the purchase of Mississippi Central Railroad shares as they may come into the market from time to time. "Mrs. Doten told the meeting that in her opinion in view of Post Publishing Company's federal income tax situation it might be desirable to buy securities *35 from time to time, the profits on the sale of which would not be subject to income taxes. "Mr. Fox said that if he were assured of repayment of amounts which he might spend for the purchase of securities, he would be willing to finance the purchase of shares of Mississippi Central Railroad Co. and Keta Gas and Oil Corp.
"After discussion, and upon motion duly made and seconded, it was unanimously "VOTED: That the president and treasurer or either of them be and hereby is authorized to purchase for, in the name, and on behalf of the corporation shares of other corporations which may seem desirable to them as investments. "The following resolutions were unanimously voted: "RESOLVED: That the president be and hereby is authorized to hold all shares bought by him for the corporation and paid for by him as a pledge for the repayment of all amounts advanced by him for them. RESOLVED: That all shares bought by the corporation whether paid for by it or the president shall be delivered to him or to the treasurer for his account to secure the re-payment of amounts due him by reason of his open account with Post Publishing Company. "RESOLVED: That the president and treasurer or *36 either of them be and is hereby authorized to sell for and on behalf of the corporation all shares owned by it at their discretion and to apply the proceeds of such sales, first: to the repayment of the president for amounts expended by him on account of shares bought by the corporation and pledged to him, and second: to the reduction of amounts due him by reason of his open account with the corporation. "February 6, 1953 "The President announced to the meeting that a natural gas well had been completed in Benezette Township, Elk County, Penna. He reported that he had had extensive conversations with geologists and petroleum engineers who were experts concerning the geology of the area in which the well had been completed, and that they were unanimous in the opinion that the completed well initiated a new major gas field. "Mr. Fox said that he held two gas and oil leases in the new field, which in the opinion of the experts concerned were certain to be productive. He said that he was willing to donate these leases, viz: the Mason, in Gibson Township, Cameron County, and the Bartoletta in Benezette Township, Elk County, to the corporation. "There was a long discussion concerning *37 Mr. Fox's offer, particularly concerning the cost of drilling wells on the proffered leases, following which, upon motion made by Mrs. Doten and seconded by Mr. Faxon, it was unanimously. "VOTED: that the corporation accept the Mason and Bartoletta leases from Mr. Fox and drill gas wells on them to the Oriskany sand. "Mr. Fox brought to the attention of the meeting that although drilling deep wells was expensive, a successful well could be used as collateral for a bank loan by an acceptable borrower, and that there was considerable doubt whether the corporation could qualify as such. Accordingly, after an exhaustive discussion, upon motion made by Mrs. Doten and seconded by Mr. Faxon, it was unanimously "VOTED: that the Mason and Bartoletta leases be retained either in the name of Mr. Fox or another nominee of the corporation, and that the name of the corporation not be disclosed as their owner, the nominees to hold the leases as undisclosed agents for the corporation. "February 10, 1953 "After discussion concerning the cost of drilling natural gas wells on the acreage that had been acquired by the corporation from John Fox on February 6, pursuant to a vote of the Board of *38 Directors passed at a meeting held on that day, upon motion duly made and seconded, it was "VOTED: that the corporation accept Mr. Fox's offer to drill and complete all wells decided to be drilled by it at the usual prices prevailing in the respective areas at the time of drilling. "After further discussion, upon motion duly made and seconded, it was "VOTED: that the corporation drill at least one well each on the Mason and Bartoletta tracts respectively, and that if either well should be successful enough to warrant further drilling, that the treasurer be and hereby is empowered to authorize such drilling on the terms set forth in the preceding vote held this day. "February 19, 1953 "Mr. Fox explained to the meeting the advantages to the corporation, both from the standpoint of actual income and from a tax standpoint, of the acquisition by the Post of Mr. Fox's holdings of 352,595 shares of North Penn Gas Company stock. He explained that if the Post could acquire, at any time, the percentage of North Penn Gas stock necessary for the filing of consolidated Federal income tax returns, it would be of very great benefit to Post Publishing Company. "After discussion, and upon *39 motion duly made and seconded, it was "VOTED: to accept as a contribution to capital 352,595 shares North Penn Gas Company stock from Mr. Fox, which are to be added to capital at the current market value of $9.00 per share. "It was stipulated by the Directors that the present bank loans for which this stock has been pledged as collateral in numerous banks shall remain the obligations of Mr. Fox and that this stock is accepted without liability to this corporation, on account of such loans, which Mr. Fox has undertaken to pay. "After discussion, and upon motion duly made and seconded, it was "VOTED: that Mr. Fox, for and on behalf of the corporation, be authorized to acquire all shares of North Penn Gas Company stock which may come into the market for the purpose of acquiring the amount of shares necessary for consolidated reporting. "May 14, 1953 "Mrs. Doten, the treasurer, reported to the Board that the corporation's Katherine Bartoletta #1 gas well had been completed on May 11 with an initial open flow of 9,500,000 cubic feet per day, and rock pressure of 3950 pounds per square inch, which made it an extremely profitable well. "The directors examined a general map of *40 the Benezette gas field and the Bartoletta lease, and were unanimously of the opinion that a second well should be immediately commenced on the Bartoletta tract, in a location to be determined by Mr. Fox after consultation separately with Mr. Lee Minter of Bradford, Penna. and Mr. Jack Gaddess of Post Allegany, Penna., the purpose being to get the independent conclusion of each. "Mr. Fox suggested that a motion authorizing the drilling of this well was in order even though, under the vote held at the previous meeting on February 10, Mrs. Doten, the treasurer, was authorized to direct the drilling of the second Bartoletta well, without further action by the Board. "Accordingly, upon motion duly made and seconded, it was unanimously "VOTED: that Mr. Fox, through his independent drilling organization, be and hereby is directed, for and on behalf of the corporation to drill a gas well on the Bartoletta lease, to be known as 'Bartoletta #2,' but in his own name as its undisclosed agent, since he can get loans from a bank in his own name, which the corporation cannot do. "Mrs. Doten pointed out that the cost of completing deep gas wells was between $60,000 and $90,000, the approximate *41 cost of the Bartoletta #1 being in the neighborhood of $70,000. She said that in addition to having to pay for this, the corporation would have to pay for its second well on the Bartoletta tract and that it was already drilling on the Mason tract, and could be expected to drill wells in addition to the wells to be presently drilling and the one already completed. "She pointed out that the cost of these three wells, together with gathering lines, rights of way, etc. would total not far from $250,000, and that it was highly desirable, that the corporation borrow against its gas income in order to finance what looked as though it would be a very successful natural gas operation. "Mr. Fox told the Board there was only one bank in New York that had any experience and knowledge of gas wells in the Appalachian Area, viz: Bank of the Manhattan Company. He said that William R. Driver, the vice president of the bank with whom he had done business, had been strongly opposed to Mr. Fox's having anything to do with Post Publishing Company. He said that Mr. Driver had made it abundantly clear to him in numerous conversations that his bank would have nothing whatever to do with the Post, for *42 which he, Driver, apparently had a life-long dislike, having originated in Boston. In the circumstances, therefore, Mr. Fox thought it highly unlikely that it would be possible for the Post to get a loan in its own name secured by natural gas production. "Mr. Fox reminded the Board, however, that this very situation had been anticipated by the Board, and had resulted in its vote held on February 6 having circumstances similar to the very ones under discussion in mind. "All the members of the Board expressed themselves as being completely familiar with the situation since all of them knew Mr. Driver well and he had expressed his opinions concerning the Post to all of them individually on divers occasions, and accordingly "Upon motion duly made and seconded, it was "VOTED: that the corporation, from time to time, borrow from any source available, including but not limited to the Bank of the Manhattan, or other banks, for the purpose of raising money for any corporate purposes, including the repayment of debts, either to its own officers or anyone else. "Upon motion duly made and seconded, it was also "VOTED: that the president, treasurer, or any director, be, and each hereby *43 is authorized to make loans for and on behalf of the corporation but nevertheless in his or her own name as its undisclosed agent, when in the opinion of the majority of the Board such borrowing would not be possible or feasible in the name of the corporation. "Upon motion duly made and seconded, it was further "VOTED: that the authority granted by the two immediately preceding votes, although general in nature and not limited to the financing of natural gas operations, specifically confers upon the president and/or treasurer full authority to borrow in the name of either from any source for the purpose of financing the corporation's natural gas operations in the Benezette-Driftwood, Pennsylvania gas fields. "After additional discussion in which all the members of the Board took part, the Board decided that whereas John Fox, the president, had heretofore expended large amounts of money for and on behalf of the corporation and is continuing to do so, and that it may be possible for him to borrow on behalf of the corporation but in his own name, using its natural gas production or other assets as security, upon motion duly made and seconded, it was "VOTED: that a majority of *44 the Board be and they hereby are authorized to reimburse Mr. Fox from time to time, as moneys may be available to the corporation, for advances previously made by him to or on behalf of the corporation, and from time to time to make advances to him that in their judgment are necessary and/or incident to the corporation's operations of any nature, this authority to continue until revoked. "August 4, 1953 "The President reported to the meeting that the Benezette gas field had become one of the great gas fields in Pennsylvania. He said that pursuant to conversations with the several directors he had negotiated a lease of a tract in Benezette Township, Elk County, Pennsylvania, with the Pennsylvania Railroad Company several weeks earlier, and that pursuant to an oral understanding with Pennsylvania Railroad officials, although a lease had not been executed, nevertheless, because of the intensive competition existing in the filed, he had, upon the assurance of the Pennsylvania Railroad people that they would execute it, started a gas well drilling on the lease for and in behalf of the corporation, which gas well was in an advanced state of completion. "Mr. Fox said that a number of *45 persons having no connection with this corporation, who had been instrumental in the obtaining of the lease, had signified their intention of taking percentages of the lease totalling, in the aggregate, 25%. "After discussion, upon motion made by Mrs. Doten and seconded by Mr. Faxon, it was unanimously "VOTED: that the actions of the President be ratified and confirmed, and that the President authorize James H. Isherwood, Esq., counsel in the matter, to do all things necessary to complete the formalizing of the lease. "Upon motion duly made and seconded, it was further "VOTED: that the President authorize Mr. Isherwood to hold the lease in his name as nominee, since the reasons which had theretofore made it desirable that the corporation not be disclosed as a principal were still present and in full force and effect. "August 20, 1953 "The president reported that the Pennsylvania Railroad Corp. Well #1, in which the corporation had a 75% interest, and which stood in the name of James H. Isherwood, Jr., had been completed, with an initial open flow of 8,000,000 cu. ft. per day. "Mrs. Doten, the treasurer, reported to the Board that she had authorized the drilling of another *46 well on the Pennsylvania R.R. Corp. tract to be known as Pennsylvania R.R. #2, in accordance with the authority previously granted her by the Board of Directors. "September 2, 1953 "Mr. Fox reported to the meeting that in accordance with the authority granted him by the vote of the Board of Directors held on August 29, 1953, he had been the successful bidder and had entered into a contract for the purchase of 404,500 shares Trans-Penn Transit Corp. Capital stock for $650,000, and had agreed to purchase its Accounts Receivable for $328,740 from 61 Broadway Corporation, all of which had been auctioned by the Supreme Court of New York. Mr. Fox said that he had advanced $100,000 on behalf of the Post to bind the purchase, and that he had executed a note of the Post maturing October 31, 1953, for $878,740 to cover the balance of the purchase price. "October 31, 1953 "VOTED: that the corporation accept from its president, John Fox, advances sufficient to pay that part of the $978,740 purchase price of Trans-Penn Transit Corp., which the corporation had been and continued to be unable to pay. "Upon motion duly made and seconded, it was further "VOTED: that the corporation, as *47 a condition of this advance, should and hereby does assign to Mr. Fox all dividends declared or to be declared by North Penn Gas Company, to which the corporation is or may be entitled, until the full amount advanced by Mr. Fox to or on behalf of Post Publishing Company will have been repaid. "November 20, 1953 "After discussion, and upon motion which was duly made and seconded, it was "VOTED: to accept as a contribution to capital 1550 shares North Penn Gas Company Capital stock, which are to be added to capital at the current market value of $10 per share. "It was stipulated by the Directors that any bank loans for which this stock has been pledged as collateral shall remain the obligation of Mr. Fox, and that this stock is accepted without liability to this corporation on account of any such loans, which Mr. Fox has undertaken to pay. "December 8, 1953 it was unanimously: "VOTED: that the president be and hereby is authorized for and on behalf of the corporation to enter into a certain lease for the development of Pennsylvania Game Commission Tract 34-B in Benezette Township, Elk County, Penna., and to do all things incident and necessary to the execution thereof. *48 * * *
"The president brought to the attention of the meeting that since a division of the Commonwealth was the lessor of the premises of which the corporation would be, after execution of the agreement with Devonian Gas & Oil Co., at best a lessee, in which case he had been advised by counsel that the leasehold interest of the corporation could not be mortgaged or in any other way encumbered, with the result that there was no reason why the lease could not stand in the name of the corporation rather than be held by it in the name of a nominee as had thitherto been done in the cases of the Mason, Bartoletta and Pennsylvania R.R. Company leases; it was accordingly the unanimous decision of the meeting that in the case of the instant agreement with Devonian Gas & Oil Co. the interest held by the corporation should be held directly by it and in its own name. "July 9, 1954 "Mr. Fox told the Board that the corporation owned more than 402,000 shares North Penn Gas Company, equal to 89.4% of the outstanding stock of that corporation, which, under the Federal income tax law, as it then stood, was not enough for consolidated income tax reporting. He said he had made a careful study *49 of the stockholders' list, and was of the opinion that it would be possible to acquire 5.6% additional shares, so as to bring the figure up to 95%, thereby gaining at least part of the year's advantage in tax savings. He said that he had arranged for a loan of $400,000 for North Penn Gas Company, which he recommended be used to make an invitation of tenders of North Penn Gas stock, which could be done through Bank of the Manhattan Company. "After discussion, upon motion duly made and seconded, it was "VOTED: that the corporation borrow $400,000 from North Penn Gas Company, and that the president and treasurer, or either of them, be and hereby are authorized to execute and deliver the corporation's note for that amount, to North Penn Gas Company. "Upon motion made and seconded, it was further "VOTED: to make an invitation of tenders of 26,000 shares North Penn Gas Company stock at $15 a share through Bank of the Manhattan Company." Fox purchased additional shares of North Penn Gas and also acquired Trans-Penn Transit Corporation and Perth Amboy Bank. For 1953 a consolidated return was filed for Post Publishing Company as parent and Trans-Penn Transit as subsidiary. For 1954 *50 a consolidated return was filed by Post Publishing Company as parent and North Penn Gas, Trans-Penn Transit, and Perth Amboy Bank as subsidiaries. On May 19, 1953, North Penn Gas declared a dividend of 50 cents per share on all shares outstanding. Fox received a check for $175,565 payable to him on account of this dividend. This amount was reported as dividend income by Post Publishing Company in its 1953 return. Under date of July 23, 1954, the Post Publishing Company made the following offer to the other stockholders of North Penn Gas Company: "Post Publishing Company, a Massachusetts corporation, owns 402,490 shares, equal to 89.44% of the 450,000 shares of authorized and outstanding stock of North Penn Gas Company. This is 5.56% short of the 95% necessary for Post Publishing Company to file a consolidated Federal Income Tax Return with North Penn Gas Company. "Post Publishing Company would derive substantial benefit from the ability to file a consolidated Federal Income Tax return with North Penn Gas Company. This benefit is peculiar and unique to Post Publishing Company because of its own financial and corporate situation, and is not available to any other shareholder *51 of North Penn Gas Company. "Post Publishing Company, therefore, desires to purchase 25,010 shares of North Penn Gas Company, and will pay $15.00 per share for all shares tendered up to 26,000 shares. The right is reserved by Post Publishing Company to refuse to accept for purchase stock received by its Agent, Bank of the Manhattan Company, in excess of 26,000 shares. "Stock tendered will be accepted and paid for in the order received. "Stock should be accompanied by the enclosed form of tender, and sent to Bank of the Manhattan Company, Corporate Trust Department, 40 Wall Street, New York, 15 N.Y." This offer will expire on August 5, 1954. Pursuant to this offer Post Publishing Company acquired additional shares. In November 1954 the Board of Directors of Post Publishing Company voted to distribute to its stockholders all the North Penn Gas Company stock held by it. On the following day the Board rescinded this action. The stock was not in fact distributed. Fox borrowed money from the Bank of the Manhattan Company pledging his gas leases as collateral. During 1953 payments were received by the Bank in the amount of $216,152.35 from gas sales relating to the Bartoletta *52 and Pennsylvania Railroad gas leases. The payments were credited against interest and principal upon the loan to Fox and statements were furnished him. The books of Post Publishing Company were kept at its office in Boston. The books of North Penn Gas were kept at Bradford, Pennsylvania. Fox's personal books were kept in his office in Boston. After the end of the year 1952 entries were posted in the books of Post Publishing Company showing receipt by the Post of the income from the dividend on the North Penn stock and debiting Fox for the amount thereof as applied against his advances to the Post. After 1953 entries were posted for 1953 crediting Gas Sales for the amount of sales under the gas leases and debiting Fox for the amounts received by him or received by the Banks for his account. The petitioners' income tax return for 1950 reported adjusted gross income of $63,395.47 and claimed deductions of $203,528.97 including interest of $194,261.26. A loss on a gas venture, capital gains of $142,458.97, rental income and expenses and various business operations were reported in detail, with depreciation computed on buildings, automobiles and trucks, airplanes, furniture and fixtures *53 and other business equipment. The petitioners' income tax return for 1952 reported adjusted gross income of $673,744.94 and claimed deductions of $721,131.18 including interest of $661,315.11 paid various banks and other lenders. A long-term gain of $40,875, from sale of Appalachian Bonds was reported, as well as many other capital asset gains or losses. Various schedules showed income and expenses of several business operations including natural gas and oil ventures and farm operations in Connecticut and Maine. Fox engaged a certified public accountant who was in practice in Boston to prepare the petitioners' returns for the years here involved. This accountant had assigned an employee to work in Fox's office or these tax matters. This employee became an alcoholic and in February 1953 collapsed and was hospitalized. At this time a brief case containing some of Fox's accounting records was lost. Fox requested and was granted an extension of time for filing the return for 1952. Fox and the accountant devoted considerable time and attention to reconstructing the lost records and preparing the return for 1952. Opinion On their income tax return for 1952 the petitioners deducted *54 as interest expense in connection withe the Treasury note transaction the amount of $142,006.85. Of this $99,923.83 represented interest from July 31 to September 15 on the loan from Seaboard to Fox. Interest income of $51,562.50 from this transaction was reported. The respondent disallowed the deduction of the net amount of interest, $48,361.33. On their income tax return for 1953 the petitioners reported interest income of $444,406.07 and long-term capital gain of $300,000 from the Treasury note transaction, and deducted as interest expense on the loan from Seaboard the amount of $742,576.95. The respondent disallowed deduction of $146,674.88 representing the net effect of the Treasury note transaction. The respondent alleges that the entire transaction in Treasury notes was nothing more than an elaborate and devious sham which merely satisfied the ritual requirements of a commercial transaction. The argument is as follows: Fox is a high bracket taxpayer. He entered into this transaction solely with a view to reduction of his tax liability. The plan was designed by Bourne and M. Eli&Livingstone of Livingstone & Company who handled the details. Fox was supposed to make a down *55 payment of $45,000. He borrowed this sum from Bourne, but only $6,500 was turned over to Livingstone & Company, by Bourne, the balance was not received by this concern until October 1957, and until then was carried on the books of Livingstone & Company as an account receivable from Fox. When Fox borrowed the balance of the purchase price from Seaboard on a nonrecourse note, he was out of pocket nothing and took no risk of loss. Neither Fox nor Seaboard received physical possession of the notes at any time. Seaboard had assets of only $2,250 but purportedly loaned over $160,000,000 including this transaction. Seaboard obtained the funds for the loan to Fox by selling short the same notes pledged as collateral by Fox. Fox had never heard of Seaboard prior to this transaction. Fox paid 2 5/8 per cent interest to carry the notes which paid only 1 3/8 per cent. The loan was without a legitimate business purpose and the excess of interest paid by Fox was not "compensation for the use or forbearance of money." There was no real indebtedness and the excess of what Fox paid was not truly interest and is not properly deductible. This was a transaction entered into for no other motive but to *56 escape taxation, citing Gregory v. Helvering, 293 U.S. 465 (1935); Commissioner v. Transport, Trading & Terminal Corp., 176 Fed. (2d) 570 (C.A. 2, 1949), certiorari denied (1950), 338 U.S. 955; and Gooding Amusement Co., Inc., 23 T.C. 408 (1954), affd. 236 Fed. (2d) 159 (C.A. 6, 1956), certiorari denied 352 U.S. 1031. In Eli D. Goodstein, et al., 30 T.C. - (August 28, 1958), we held that a similar transaction in which the taxpayer purported to purchase $10,000,000 face amount of U.S. Treasury notes, giving his note for all but $15,000 of the purchase price was lacking in substance and did not create a real indebtedness and that deductions of amounts purportedly paid as interest upon his note were properly disallowed. The transaction in that case was also carried out with Seaboard Investment Company and M. Eli Livingstone operating as Livingstone & Company. It was carried out in the same manner generally as Fox's transaction. Although Goodstein paid amounts representing interest before the interest dates and *57 borrowed corresponding amounts back from the lender while Fox did not make such payments until the due dates, that fact is not sufficient to distinguish the cases. There was no more substance to the transaction in Fox's case than in the Goodstein case. It was entered into only to lend color to a claimed obligation to pay interest to support a tax deduction. There was no intention that Fox actually acquire the Treasury notes or that he would actually borrow from Seaboard. Seaboard had no funds to lend and accomplish its part only by selling short the notes purportedly bought. The money Fox actually advanced represented merely a fee or commission for arranging the transaction. The deductions claimed were properly disallowed. The petitioners claimed deductions from their income in 1952 for amortization of bond premiums and for the excess of interest paid over the interest received in connection with the Appalachian Electric Power Company bonds. The respondent disallowed the deductions claimed and contends that the two transactions involving such bonds were lacking in commercial substance and were entered into by Fox solely with a view to reducing his tax liability. Fox made no down *58 payment on the Appalachian bonds and borrowed the entire purchase price from Dartmouth for which he gave a non-recourse note bearing interest at 5 1/2 per cent and secured by the bonds. The respondent says that the arrangement under which the bonds were purchased included an option to Dartmouth to repurchase at the price Fox had paid and that the existence of such an option is borne out by the fact that Fox sold the notes to Dartmouth at exactly the prices he paid originally and also is shown in correspondence concerning the deal. Fox denied that such an option was given Dartmouth to repurchase at his cost. The correspondence referred to concerns a proposed deal including such an option which Fox considered making. He sought advice upon the proposal and was advised by investment counsel that with such an option he would have no further economic interest in the deal, since if the market price rose he would not get the bonds back from the lender and if the market price fell he would not take them back. Fox testified that upon this advice he refused to grant such an option in the actual transactions and that he sold the bonds at the market prices, which happened to be in each case the *59 price he had paid. The respondent had subpoenaed Bourne as a witness and he was present at the hearing. He was one of the trustees of Dartmouth. Fox had testified that no option to repurchase was given Dartmouth. No one called upon Bourne to testify. The notes given by Fox contain no such option as alleged and there is no affirmative evidence of it. Upon the record we cannot find that such an option was given. On his part, Fox contends that he made a real investment and had an opportunity for gain on the two transactions in Appalachian bonds. He paid $15,000 from borrowed funds and transferred shares of stock to meet his obligation for interest. He anticipated a rise in the market value of the bonds and knew he had a right to amortize the premium. He claimed a deduction in the amount of $80,625 in 1951 for amortization of the premium and the respondent says that upon the sale of the bonds in 1952 a long-term capital gain of this amount was realized which was never returned as income. Fox says that he realized a profit of $1,703.10 on the sale of the second block of these bonds. He points out that if he had held the bonds for a few months longer he could have had a substantial profit *60 as the price bid reached 115 3/4 at the end of May 1953. These factors are not sufficient to show that the transactions were substantive and with a business purpose. Fox paid nothing at the time of the purchase, borrowed the entire purchase price on the security of the bonds thus acquired, and by giving a nonrecourse note stood no risk of loss. He agreed to pay more interest than he was to receive, but he was not to be personally liable if the proceeds of the sale of the collateral were insufficient to meet the obligation. Although there is no showing whether Dartmouth "sold short" the Appalachian bonds, as the purported lender did in the Treasury note transaction, there was no more substance to these transactions than in the Treasury note case. There was no real indebtedness, no real purchase of the bonds and no real payment of interest. The respondent's disallowance of the deductions claimed was correct. See Eli D. Goodstein, supra. Fox acquired the Post Publishing Company in September 1952. He contends that in February 1953 he donated to the Post his equity in some 350,000 shares of North Penn Gas Company. This stock had been pledged with certain banks as collateral for loans *61 to Fox personally. Fox also contracted to buy other shares of North Penn Gas for the Post and advanced various other funds to it. Fox contends that a dividend of $175,565 on the North Penn stock which he received was not income to him, but was income to the Post which pursuant to agreement was turned over to him to apply upon the Post's indebtedness to him. He says that he planned to give the Post enough of the North Penn stock so that a consolidated tax return could be filed and the Post's losses offset by the North Penn income. The stock certificates had been endorsed in blank as "street" certificates and retained by the lending banks. The Cleveland Trust Company held a large amount of the pledged stock. Fox says that he was advised by an officer of the Cleveland Trust Company that the loan would be called if the bank was informed of the transfer but that Fox could hold the stock as nominee of the Post. He did not acquire for the Post 95 per cent of the North Penn Gas stock during 1953 but it appears that sufficient stock was acquired to permit the filing of a consolidated return for 1954 when the requirement was reduced to 80 per cent. The respondent determined that the dividend *62 paid on the North Penn Gas stock in 1953 was income to Fox, not to the Post. The argument is that the stock was never actually transferred to the Post and that Fox exercised all the incidents of ownership, that he never had the stock transferred on the stock records of North Penn, that the books of the Post do not show receipt of the dividend, that Fox admittedly received the dividend and the Post did not, that on November 19, 1954, all the stock purportedly held by the Post was distributed to the Post's sole stockholder (Fox) as a dividend and was transferred back the next day to the Post as a contribution to capital and was again distributed to Fox as a dividend at the end of 1954, that a dividend declared by North Penn in 1954 was not paid to the Post but was applied by North Penn against the personal indebtedness of Fox to it, and when the stock was sold in 1954 Fox received all the proceeds. Under these circumstances, the respondent contends that Fox had full command over the property and enjoyment of its economic benefits, and is the real owner for tax purposes, citing Helvering v. Clifford, 309 U.S. 331 (1940); Helvering v. Horst, 311 U.S. 112 (1940); *63 Helvering v. Eubank, 311 U.S. 122 (1940); and Commissioner v. Sunnen, 333 U.S. 591 (1948) and other cases. A similar argument is made concerning the taxability of the income received in 1953 from the sales of gas produced on the Bartoletta and Pennsylvania Railroad leases in the amount of $216,152.35. Fox says that he assigned these leases to the Post Publishing Company as a contribution to capital and contends that this income was income of the Post. The respondent contends that the Post never received the benefit of it when it was applied on his personal loans from the Bank of the Manhattan Company, that it has not been shown that the alleged transfer was ever recorded with the recorder of deeds where the leases were located, that the lessee dealt only with Fox as owner and made remittances to the Bank pursuant to Fox's instructions and that the cash book of the Post does not show receipt of this income, that even if it is assumed that he transferred the leases to the Post, he, as sole owner of the Post, completely dominated the leases and used the proceeds for his own benefit alone. The minutes of the Board of Directors of the Post show that 352,595 *64 shares of North Penn stock were accepted in February 1953 as a contribution to capital. The certificates were held by various banks as collateral for loans made to Fox and hence could not be delivered to the Post. All that Fox could give the Post was his equity in the shares over and above the loans. Fox testified that he made a written assignment to the Post and also notified North Penn of the transfer. The post was later declared bankrupt and taken over by trustees. The transaction in November 1954 is explained as occurring in connection with a loan negotiated with the Bank of the Manhattan Company for the Trans-Penn Transit Company, one of the Post's subsidiaries. Counsel for the Bank were of the opinion that since North Penn was a public utility and a subsidiary of the Post the loan might run afoul of the Public Utility Holding Company Act. Fox testified that at the suggestion of the Bank the stock of North Penn was distributed to Fox as a dividend, the loan was then made and Fox returned the stock to the Post as a contribution to capital. After the bankruptcy of the Post Fox petitioned for a determination of the District Court in the bankruptcy proceeding as to the ownership of *65 the North Penn stock and these gas leases, but the record does not reveal what action was taken upon his petition. This presents the ofttimes troublesome problem of distinguishing between a corporation and an individual owning all its stock where the individual may transfer property to or from the corporation as it may suit his own purposes. The fact that the dividend was received and retained by Fox is not determinative. The receipt of the dividend was carried onto the books of the Post by a year-end entry. The records of the Board of Directors disclose the intention that the Post own the stock subject to the privilege of Fox to use it as security for loans and to apply the dividends against his advances made to the Post in greater amounts. Likewise the donation of the gas leases, the income from which was to be applied upon Fox's loan from the Bank of the Manhattan Company, is shown in the minutes of the Post's directors' meetings. There was nothing sham or unreal about the Post Publishing Company. It published a newspaper for many years in Boston. Only in exceptional circumstances is the *66 corporate entity to be disregarded. Dalton v. Bowers, 287 U.S. 404 (1932); New Colonial Ice Co. v. Helvering, 292 U.S. 435 (1934). The statute invoked by Fox, section 141, Internal Revenue Code of 1939, authorizes the filing of consolidated returns by an affiliated group of corporations, where stock possessing at least 95 per cent of the voting power and of the non-voting stock of each is owned directly by one or more of the others. (The corresponding provisions of the Internal Revenue Code of 1954, sections 1501-1505, require 80 per cent ownership.) The statute prescribes no test of affiliation other than stock ownership. Even if Fox's primary purpose was to reduce his own tax liabilities by offsetting the probable losses from the Post against the expected income from the dividends and gas leases through the means of a consolidated return, that is a legitimate purpose and the action is authorized by the statute. The respondent erred in determining that the dividend on North Penn stock in 1953 and the income from the Bartoletta and Pennsylvania Railroad gas leases was income to Fox. The respondent determined additions to tax *67 for 1950 and 1952 for negligence or intentional disregard of rules and regulations. The return for 1950 involved difficult accounting problems, capital gains and losses, rental income, business income and expenses and costs of a gas venture. The return reported adjusted gross income of $63,395.47, and claimed deductions exceeding this amount. The original deficiency determined was over $50,000 and this was by agreement on other issues reduced to $2,593.48. The addition of $191.91 for negligence under these circumstances is not warranted. The petitioners encountered difficulties in the preparation of their return for 1952. A brief case full of Fox's records was lost in February 1953 when an employee who had become an alcoholic was hospitalized. Fox requested and was granted an extension of time for filing the return for 1952 and devoted considerable time and attention to reconstructing the lost records and preparing the return. The return filed was complicated. It reported gross income of $673,744.94 and deductions exceeding this amount. The respondent originally determined a deficiency of $352,583.94. By stipulation this has been reduced to $164,043.18, and as a result of our conclusions *68 upon issues in this proceeding will be further reduced. The addition to tax for negligence is not warranted under these circumstances. Decision will be entered under Rule 50.